**No. 26-7231**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

United States of America,
*Plaintiff-Appellant*,

v.

State of California, *et al.*,
*Defendants-Appellees.*

and

Services, Immigrant Rights and Education Network, *et al.*,
*Intervenor-Defendants-Appellees*

*On Appeal from the United States District Court for the Central District of California, Case No. 2:26-cv-12025-DOC-ADS*

# BRIEF OF BIPARTISAN FORMER GOVERNORS AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES

Andrew J. Rising
Carlos Guevara
Candice Cho
GOVERNORS SAFEGUARDING DEMOCRACY
2300 North Street, NW, Suite 501A
Washington, D.C. 20037
Telephone: (213) 933-2126

Julia Spiegel
Emily Kirby
Charanya Krishnaswami
Megan Flynn
GOVERNORS ACTION ALLIANCE
2300 North Street, NW, Suite 501A
Washington, D.C. 20037
Telephone: (301) 450-3151

Carey R. Dunne
*Counsel of Record*
Mónica Folch
Stephen Cha-Kim
Zack Goldberg
Martha Reiser
FREE AND FAIR LITIGATION GROUP, INC.
266 West 37th Street, 20th Floor
New York, NY 10018
Telephone: (646) 434-8604
carey@freeandfair.org

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTERESTS OF AMICI ........ 1

SUMMARY OF ARGUMENT ........ 3

ARGUMENT ........ 7

I. The Constitution Enshrines a System of Electoral Federalism ........ 8

II. Electoral Federalism Confers Substantial Benefits on our Nation and Citizenry ........ 10

III. This Lawsuit Is a Brazen Attempt to Usurp State Election Authority in Violation of the Constitution and Federal and State Law ........ 16

CONCLUSION ........ 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Allen v. Milligan*,
608 U.S. 511 (2026) .......... 22

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013) .......... 4, 6, 19

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*,
576 U.S 787 (2015) .......... 16

*Cnty. of Nassau v. New York*,
724 F. Supp. 2d 295 (E.D.N.Y. 2010) .......... 9

*Colorado v. DeJoy*,
No. 20-cv-2768, 2020 WL 5513567 (D. Colo. Sept. 14, 2020) .......... 8

*Common Cause/New York v. Brehm*,
432 F. Supp. 3d 285 (S.D.N.Y. 2020) .......... 9

*Democratic Nat'l Comm. v. Wis. State Legislature*,
141 S. Ct. 28 (2020) .......... 12

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) .......... 7

*Ill. State Bd. Elections v. Socialist Workers Party*,
440 U.S. 173 (1979) .......... 7

*Kobach v. U.S. Election Assistance Comm'n*,
772 F.3d 1183 (10th Cir. 2014) .......... 18

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025) .......... 8

*League of Women Voters of United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 18

*Merrill v. Milligan*,
142 S. Ct. 879 (2022) .......... 10, 11

*Moore v. Harper*,
600 U.S. 1 (2023) .......... 11

*Powell v. McCormack*,
395 U.S. 486 (1969) .......... 3

*Printz v. United States*,
521 U.S. 898 (1997) .......... 7

*Pub. Int. Legal Found., Inc. v. Nago*,
174 F.4th 664 (9th Cir. 2026) .......... 19

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......... 23

*Roudebush v. Hartke*,
405 U.S. 15 (1972) .......... 4

*Rucho v. Common Cause*,
588 U.S. 684 (2019) .......... 5

*Smiley v. Holm*,
285 U.S. 355 (1932) .......... 4

*State v. Meadows*,
88 F.4th 1331 (11th Cir. 2023) .......... 6, 8

*State of California v. Trump*,
835 F. Supp. 3d 288 (D. Mass. 2026) .......... 6

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) .......... 12

*U.S. Term Limits, Inc. v. Thornton*,
514 U.S. 779 (1995) .......... 4

*Williams v. Rhodes*,
393 U.S. 23 (1968) .......... 7

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) .......... 4

**Constitutional Provisions:**

Cal. Const., art. II, § 2 .......... 21

U.S. Const., art. I, § 4, cl. 1 .......... 4, 8

**Statutes & Regulations:**

18 U.S.C. § 611 .......... 22

52 U.S.C. § 20507(c)(2)(A) .......... 20

52 U.S.C. § 20510(a) .......... 22

52 U.S.C. § 21083(a)(1)(A) .......... 19

52 U.S.C. § 21083(a)(5)(A)(iii) .......... 20

52 U.S.C. § 21083(b)(4)(A)(i) .......... 18

52 U.S.C. § 21111 .......... 22

Cal. Code Regs. tit. 2, § 20879(b) .......... 21

Cal. Elec. Code § 2101(a) .......... 21

Cal. Elec. Code § 2111 .......... 21

Cal. Elec. Code § 2201(a)(8) .......... 21

Cal. Elec. Code § 14240(c) .......... 22

Cal. Elec. Code § 15106 .......... 21

Cal. Elec. Code § 16100(d) .......... 22

**Other Authorities:**

Christopher R. Berry, *Democracy Reform Primer Series: The Timing of Local Elections*, U. Chicago (Jan. 25, 2024) .......... 11

Jess Brouard, *States, Not the President, Run Elections in America*, State Court Report (Oct. 21, 2025) .......... 11

*Election Administration at State and Local Levels*, Nat'l Conf. of State Legislatures (Jan. 13, 2026) .......... 11, 15

The Federalist No. 51 (Alexander Hamilton) ........................................ 7

Gallup, *Americans Trust Local Government Most, Congress Least* (Oct. 13, 2023) ........................................................12

Lauren Miller Karalunas, *Nevada Election Board Officers: Rules and Constraints*, Brennan Center for Justice (March 18, 2024) ..................................................................14

Lauren Miller Karalunas, *Ohio Precinct Election Officials: Rules and Constraints*, Brennan Center for Justice (March 18, 2024) ..................................................................14

Lauren Miller Karalunas, *Pennsylvania Election Officers: Rules and Constraints*, Brennan Center for Justice (March 18, 2024) .................................................................14

Lauren Miller Karalunas, *Wisconsin Election Officers: Rules and Constraints*, Brennan Center for Justice (March 18, 2024) .................................................................14

Adam Kuckuk, *For an Odd Year, 2025 Packs Big Elections*, Nat'l Conf. of State Legislatures (Sept. 23, 2025) ..............................10

David Landau, et al., *Federalism, Democracy, and the 2020 Election*, 99 Tex. L. Rev. Online 96 (2021) ........................................15

Mitch McConnell, *Trump Gives Democrats a Voting Gift*, Wall St. J. (Apr. 7, 2025) ................................................................... 9

Pew Research Center, *On issue after issue, Americans say things are going better locally than nationally*, (Feb. 10, 2025).....................................................................12

Wendy Weiser, *Michigan Election Inspectors: Rules and Constraints*, Brennan Center for Justice (March 18, 2024) ..................................................................13

## INTERESTS OF AMICI

Amici curiae are a bipartisan group of former governors who served as their states' chief executives and, in that capacity, were among those responsible for the administration of elections in their respective states.[1] Several Amici also served as state election officials themselves, including four who served as Secretary of State prior to becoming Governor. In those roles, Amici exercised the substantial authority delegated to the states by the Elections Clause and ensured the integrity and efficiency of state and federal elections within their states.

The former governors represent diverse political affiliations, geographies, and tenures, yet are unified in their support for Defendants-Appellees in this case. Amici submit that the relief sought by the federal executive in this case offends the Constitution's careful balance of state and federal authority, undermines state executives' ability to ensure free and fair elections within their states, and breaks with a long tradition of

[1] No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparation or submission of this brief. Counsel for amici sought consent of all parties in connection with this amicus brief: Defendants-Appellees do not oppose, Plaintiff-Appellant takes no position, and Intervenors-Appellees consent.

cooperation between Congress and the states concerning election administration. Amici in support of this brief are:

- Neil Abercrombie, Governor of Hawaii from 2010 to 2014.
- Jerry Brown, Governor of California from 1975 to 1983 and 2011 to 2019; Secretary of State of California from 1971 to 1975.
- Kate Brown, Governor of Oregon from 2015 to 2023; Secretary of State of Oregon from 2009 to 2015.
- Steve Bullock, Governor of Montana from 2013 to 2021.
- Arne Carlson, Governor of Minnesota from 1991 to 1999.
- Chet Culver, Governor of Iowa from 2007 to 2011; Secretary of State of Iowa from 1999 to 2007.
- Gray Davis, Governor of California from 1999 to 2003.
- Mark Dayton, Governor of Minnesota from 2011 to 2019.
- Jim Doyle, Governor of Wisconsin from 2003 to 2011.
- Parris Glendening, Governor of Maryland from 1995 to 2003.
- Jennifer Granholm, Governor of Michigan from 2003 to 2011.
- Bill Graves, Governor of Kansas from 1995 to 2003; Secretary of State of Kansas from 1987 to 1995.
- Gary Locke, Governor of Washington from 1997 to 2005.
- Jack Markell, Governor of Delaware from 2009 to 2017.
- Terry McAuliffe, Governor of Virginia from 2014 to 2018.

- Janet Napolitano, Governor of Arizona from 2003 to 2009; United States Secretary of Homeland Security from 2009 to 2013.
- Martin O'Malley, Governor of Maryland from 2007 to 2015.
- Deval Patrick, Governor of Massachusetts from 2007 to 2015.
- Pat Quinn, Governor of Illinois from 2009 to 2015.
- Marc Racicot, Governor of Montana from 1993 to 2001.
- Bill Ritter Jr., Governor of Colorado from 2007 to 2011.
- Kathleen Sebelius, Governor of Kansas from 2003 to 2009.
- Steve Sisolak, Governor of Nevada from 2019 to 2023.
- Eliot Spitzer, Governor of New York from 2007 to 2008.
- Tom Vilsack, Governor of Iowa from 1999 to 2007.
- Bill Weld, Governor of Massachusetts from 1991 to 1997.
- Christine Todd Whitman, Governor of New Jersey from 1994 to 2001.
- Tom Wolf, Governor of Pennsylvania from 2015 to 2023.

## SUMMARY OF ARGUMENT

Free and fair elections are the cornerstone of our constitutional system. The right to vote is "'so essential for the preservation of all their other rights, that it ought to be considered as one of the most sacred parts of our constitution.'" *Powell v. McCormack*, 395 U.S. 486, 534 n.65 (1969) (quoting 16 Parl.Hist.Eng. 589–90 (1769)). Voting is a "fundamental

political right," because it is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).[2]

The Constitution expressly delegates authority to the states to safeguard this right in the Elections Clause. *See* U.S. Const., art. I, § 4, cl. 1; *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8 (2013); *Roudebush v. Hartke*, 405 U.S. 15, 24 (1972). The Clause is an "express delegation[ ] of power to the States to act with respect to federal elections," *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 805 (1995), and it provides states with

> authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.

*Smiley v. Holm*, 285 U.S. 355, 366 (1932). The authority conferred by the Elections Clause is of course "checked and balanced" by Congress, but it

[2] Internal citations, quotation marks, and alterations are omitted from all case quotations unless otherwise noted.

resides "primarily" with the states. *Rucho v. Common Cause*, 588 U.S. 684, 699 (2019).

In the experience of Amici, bipartisan former governors from across the United States, states embrace this crucial role expressly assigned to them by the Constitution. By and large, the officials who work in the 10,000 election administration jurisdictions across the United States serve with honor and a sense of obligation to their communities and to the Constitution. In Amici's experience, state and local election officials, whatever their party, are dedicated, highly competent, responsible, accountable, and transparent. Even in the face of increasing threats and harassment stemming from election misinformation, state and local officials admirably discharge their duties and ensure that elections are free and fair. By design, this balanced and decentralized system serves not only as a bulwark against efforts to undermine democracy, but to foster confidence and trust among the voting public.

Against this backdrop, Amici respectfully submit that this lawsuit constitutes a brazenly unlawful and dangerous effort by the federal executive to usurp states' authority to administer elections. The "Constitution does not spell out a role for the President in the operation

of state voting procedures in federal elections." *State v. Meadows*, 88 F.4th 1331, 1346 (11th Cir. 2023). Indeed, "[t]he Constitution does not grant the President any specific powers over elections." *State of California v. Trump*, 835 F. Supp. 3d 288, 298 (D. Mass. 2026). Rather, states retain the "responsibility for the mechanics of congressional elections" subject only to Congress's authority under the Elections Clause. *Inter Tribal Council of Ariz., Inc.*, 570 U.S. at 9. Only Congress—not the Executive Branch—has the "power to alter" state election regulations "or supplant them altogether." *Id.* at 8. And Congress has used its Elections Clause authority in partnership with state agencies to carry out voter registration for the election of members of Congress through a handful of federal statutes, including the National Voter Registration Act (NVRA) and the Help America Vote Act (HAVA). But the relief sought here by the federal government will expressly violate those federal laws, undermine trust in elections, arbitrarily disenfranchise eligible voters, and undermine the constitutional role of states in ensuring free and fair elections. Amici submit that this lawsuit constitutes a direct assault on our democracy and our constitutional order, and this Court should deny the requested relief.

## ARGUMENT

Our system of constitutional federalism safeguards liberty. "[T]he Framers rejected the concept of a central government that would act upon and through the States, and instead designed a system in which the State and Federal Governments would exercise concurrent authority over the people." *Printz v. United States*, 521 U.S. 898, 919–20 (1997). This "healthy balance of power between the States and the Federal Government . . . reduce[s] the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). Federalism may on occasion be cumbersome, but the Founders understood that, through the dispersion of authority, "a double security arises to the rights of the people." The Federalist No. 51 (Alexander Hamilton).

This general principle applies with particular force in the context of elections. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Williams v. Rhodes*, 393 U.S. 23, 31 (1968). Voting, and therefore free and fair elections, are "of the most fundamental significance under our constitutional structure." *Ill. State Bd. Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979).

## I. The Constitution Enshrines a System of Electoral Federalism

The Constitution expressly delegates primary authority over elections to the states, subject to congressional—not federal executive—oversight. The Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1.

The federal executive has no constitutional role in election administration beyond the enforcement of laws enacted by Congress pursuant to its Election Clause authority. *See Meadows*, 88 F.4th at 1346–47. Indeed, "executive regulatory authority over federal elections does not appear to have crossed the Framers' minds." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 159 (D.D.C. 2025). The federal executive has no authority to interfere with, much less override, state authority to regulate elections. *See Colorado v. DeJoy*, No. 20-cv-2768, 2020 WL 5513567, at *2 (D. Colo. Sept. 14, 2020) (holding that executive agency of the federal government does not have authority to override state election laws).

Federal statutes enacted pursuant to Congress's authority under the Elections Clause respect this constitutional structure and preserve, rather than undermine, states' authority to administer elections. The NVRA and HAVA, for example, together establish a "floor" for federal election administration standards, preserving state officials' discretion to determine appropriate implementation mechanisms that meet the needs of their state and citizenry.[3] In the NVRA and HAVA, Congress confirmed through law what Amici know from experience—that election administration requires the kind of flexibility and local knowledge that state and local officials possess, and that federal officials do not.[4]

---

[3] *See, e.g.*, *Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285, 317 (S.D.N.Y. 2020) (discussing *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 762 (2018), and explaining that "the NVRA sets the floor for how states conduct list maintenance; states have discretion to choose how precisely to follow its requirements," and "[s]tates take a variety of approaches in complying with the NVRA's requirements"); *Cnty. of Nassau v. New York*, 724 F. Supp. 2d 295, 298 (E.D.N.Y. 2010) (noting that relevant provisions in HAVA "set[] minimum requirements for federal elections," and that "[t]he specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State.").

[4] *See* Mitch McConnell, *Trump Gives Democrats a Voting Gift,* Wall St. J. (Apr. 7, 2025), https://archive.ph/30TWq ("When we wrote the Help America Vote Act, we took care to reinforce—not undermine—the limits of federal involvement in America's Elections."); *id.* ("[D]elegation of authority over election administration is crystal clear. Elections may

## II. Electoral Federalism Confers Substantial Benefits on our Nation and Citizenry

In Amici's experience, the default rule of state control established by the Elections Clause promotes and protects free and fair elections. Because the Constitution has delegated election authority to states since the Founding, states have developed deep practical and institutional expertise in managing the "extraordinarily complicated" task of running statewide elections. *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring in grant of stay). The overwhelming majority of elections conducted in the United States every year are for state and local offices,[5] and many occur during odd-numbered years, completely independent from even-year federal elections.[6] The actual work of

---

have national consequences but the power to conduct them rests in state capitols.").

[5] *See, e.g.*, Jess Brouard, *States, Not the President, Run Elections in America*, State Court Report (Oct. 21, 2025), https://statecourtreport.org/our-work/analysis-opinion/states-not-president-run-elections-america (noting that 2026 midterm elections will be for "all 435 House seats, 33 Senate seats, and thousands of state legislature seats across the country").

[6] *See, e.g.*, Adam Kuckuk, *For an Odd Year, 2025 Packs Big Elections*, Nat'l Conf. of State Legislatures (Sept. 23, 2025), https://www.ncsl.org/state-legislatures-news/details/for-an-odd-year-2025-packs-big-elections (discussing 2025 state-level elections in Virginia and New Jersey, and 2027 elections in Kentucky, Louisiana,

running these elections is done by local officials in the more than 10,000 election administration jurisdictions across the country.[7]

This decentralized system "allows individual jurisdictions to experiment and innovate—to see how elections might best be run for the state and the locality's particular circumstances."[8] Elections require "enormous advance preparations by state and local officials, and pose significant logistical challenges" that state officials are uniquely qualified and situated to address. *Merrill*, 142 S. Ct. at 880. In Amici's experience, states admirably discharge their responsibility for establishing "rules that dictate everything from the date on which voters will go to the polls to the dimensions and font of individual ballots." *Moore v. Harper*, 600 U.S. 1, 29 (2023). State officials exercise their discretion under the Elections Clause to make countless "difficult decisions about how best to

---

and Mississippi); Christopher R. Berry, *Democracy Reform Primer Series: The Timing of Local Elections*, U. Chicago (Jan. 25, 2024), https://effectivegov.uchicago.edu/primers/the-timing-of-local-elections ("Most local elections are held off-cycle, on separate days from higher profile state and federal elections.").

[7] *Election Administration at State and Local Levels*, Nat'l Conf. of State Legislatures (Jan. 13, 2026), https://www.ncsl.org/elections-and-campaigns/election-administration-at-state-and-local-levels.

[8] *Id.*

structure and conduct elections" that reflect their respective state's varying needs and priorities. *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31–32 (2020) (Kavanaugh, J., concurring).

Amici submit that our system of electoral federalism also increases trust among the electorate. "State run elections mean that voters recognize their neighbors who staff polling stations, trust their Secretaries of State—whom they voted for—to keep their personally identifying information safe, and believe that they will not be targeted because of what they look like or who they vote for." *United States v. Weber*, 816 F. Supp. 3d 1168, 1176 (C.D. Cal. 2026). This is borne out in survey data, which demonstrates that Americans view their state and local officials far more positively than federal officials,[9] and that they have substantially more trust and confidence in state and local officials as compared to federal officials.[10] In this era of rampant election

[9] *See* Pew Research Center, *On issue after issue, Americans say things are going better locally than nationally*, (Feb. 10, 2025), available at https://www.pewresearch.org/short-reads/2025/02/10/on-issue-after-issue-americans-say-things-are-going-better-locally-than-nationally/.

[10] *See* Gallup, *Americans Trust Local Government Most, Congress Least* (Oct. 13, 2023), available at https://news.gallup.com/poll/512651/americans-trust-local-government-congress-least.aspx.

misinformation, the authority exercised by the states under the Elections Clause serves as a bulwark against the further erosion of public confidence in our electoral system.

As both a cause and a consequence of these features, state and local election administration is also less partisan than the current national discussion about elections would suggest. Many states, including states in which Amici served as governors and secretaries of state, have regulations that specifically address partisanship, and give both major political parties an equal role in ensuring the integrity of state-run elections. In Michigan, for example, election inspectors are employed by local county clerks, and each clerk must have at least one inspector from each major political party.[11] And at voting locations, while voting is ongoing, many tasks must be completed by bipartisan pairs of election workers, including "assisting voters who request instruction after entering a voting station; opening any electronic tabulating equipment during the day to ensure its proper operation; sealing ballot containers,

---

[11] *See generally* Wendy Weiser, *Michigan Election Inspectors: Rules and Constraints*, Brennan Center for Justice (March 18, 2024), https://www.brennancenter.org/our-work/research-reports/michigan-election-inspectors-rules-and-constraints.

electronic devices, or any other election materials; and delivering documents and sealed ballots after the polls close."[12] Nevada,[13] Ohio,[14] Pennsylvania,[15] and Wisconsin,[16] to name just a few examples of states in which Amici have served as governors, have laws that similarly require bipartisan cooperation in election administration and monitoring.

---

[12] *Id.*

[13] *See generally* Lauren Miller Karalunas, *Nevada Election Board Officers: Rules and Constraints*, Brennan Center for Justice (March 18, 2024), https://www.brennancenter.org/our-work/research-reports/nevada-election-board-officers-rules-and-constraints.

[14] *See generally* Lauren Miller Karalunas, *Ohio Precinct Election Officials: Rules and Constraints*, Brennan Center for Justice (March 18, 2024), https://www.brennancenter.org/our-work/research-reports/ohio-precinct-election-officials-rules-and-constraints.

[15] *See generally* Lauren Miller Karalunas, *Pennsylvania Election Officers: Rules and Constraints*, Brennan Center for Justice (March 18, 2024), https://www.brennancenter.org/our-work/research-reports/pennsylvania-election-officers-rules-and-constraints.

[16] *See generally* Lauren Miller Karalunas, *Wisconsin Election Officers: Rules and Constraints*, Brennan Center for Justice (March 18, 2024), https://www.brennancenter.org/our-work/research-reports/wisconsin-election-officials-rules-and-constraints.

Finally—and critically—"[t]he dispersed responsibility for running elections also makes it extremely difficult, if not impossible, to rig U.S. elections at the national level."[17] In the election context,

> states do not just serve as 'guard dogs' for any federal misbehavior or as governments that compete with the federal government for voter affection. Instead, states remain significantly functionally independent of, and resistant to capture by, the Executive Branch due to a uniquely American mix of tradition, doctrine, and resource constraints.[18]

This system is occasionally inefficient, but it makes the risk of partisan capture "far less likely" and acts as a "reasonably effective bulwark against efforts by an authoritarian president to make the overall electoral playing field unfair."[19]

Thanks to the Founders' forethought, the division of authority established by the Elections Clause continues to confer benefits on our nation, states, and citizenry. The primacy of state lawmaking and state

---

[17] *Election Administration at State and Local Levels*, Nat'l Conf. of State Legislatures (Jan. 13, 2026), https://www.ncsl.org/elections-and-campaigns/election-administration-at-state-and-local-levels.

[18] David Landau, et al., *Federalism, Democracy, and the 2020 Election*, 99 Tex. L. Rev. Online 96, 100 (2021).

[19] *Id.* at 104.

lawmakers in this area "allows local policies more sensitive to the diverse needs of a heterogeneous society, permits innovation and experimentation, enables greater citizen involvement in democratic processes, and makes government more responsive by putting the States in competition for a mobile citizenry." *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S 787, 817 (2015). Amici respectfully submit that our system of electoral federalism is a cornerstone of our democracy, and we—the courts, elected officials at all levels of government, and citizens—should zealously defend it.

## III. This Lawsuit Is a Brazen Attempt to Usurp State Election Authority in Violation of the Constitution and Federal and State Law

The federal executive's demand that state and local election officials refuse to count thousands of ballots cast by duly registered voters strikes at the heart of our system of electoral federalism. Congress and the states have already established rules—pursuant to their Elections Clause authority—for determining voter eligibility, maintaining accurate registration rolls, and resolving challenges to particular ballots or registrants. Those rules reflect considered judgments about how best to prevent unlawful voting while protecting eligible citizens from

disenfranchisement. Yet the federal executive now asks this Court to displace those constitutionally authorized judgments about election administration. As a substitute, the federal executive asserts that it—not Congress, and not California—has the authority to determine voter eligibility and the power to prevent local election officials from counting thousands of ballots based on its own unspecified, speculative evidence of non-citizen voting. That assertion is antithetical to our system of electoral federalism and in direct conflict with existing law.

As former governors, Amici understand the importance of reliable procedures that enable local election officials to discharge their obligations under both federal and state election laws, including those laws that balance the need to prevent unlawful voting with the risk of disenfranchising eligible voters. Indeed, California law, like the election laws of many other states, already establishes thorough processes to enforce citizenship requirements and adjudicate voter eligibility disputes, pursuant to California's Election Clause authority. But the federal government's requested relief would require state and local election officials to disregard those laws they are responsible for

administering and cause lasting damage to our system of constitutional democracy in the process.

First, existing federal law already expressly addresses citizenship requirements for voter registration. The NVRA requires federal registration forms to identify citizenship as an eligibility requirement and requires applicants to attest, under penalty of perjury, that they satisfy the specified qualifications, including citizenship status. 52 U.S.C. § 20508(b)(2); *see also League of Women Voters of United States v. Newby*, 838 F.3d 1, 5 (D.C. Cir. 2016) (discussing NVRA requirements and restrictions on information needed to register on federal forms). HAVA likewise requires that federal registration forms require applicants to attest to their citizenship. *See* 52 U.S.C. § 21083(b)(4)(A)(i).

Congress, in its considered judgment, determined that citizenship attestations—made under penalty of perjury—struck the proper balance between preventing unlawful voting and ensuring that eligible voters can freely exercise their fundamental right to vote. *See Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1195 n.7 (10th Cir. 2014) (explaining that Congress concluded that attestations and criminal penalties provided "sufficient safeguards to prevent noncitizens from

registering to vote"). And the Supreme Court has rejected attempts to impose additional citizenship verification requirements on would-be voters beyond those authorized by Congress. *See Inter Tribal Council of Arizona, Inc.*, 570 U.S. at 20 (holding that states could not require applicants to submit citizenship information beyond that required under the NVRA). The federal executive's demand in this case would thus require California to reconsider thousands of voter registrations pending additional citizenship information that Congress has not required.

Second, Congress assigned responsibility for administering voter registration lists to state and local election officials, subject only to specific federal safeguards. The NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of a death or change in residence of the registrant." *Pub. Int. Legal Found., Inc. v. Nago*, 174 F.4th 664, 667 (9th Cir. 2026). Similarly, HAVA requires "each *State*, acting through the chief State election official" to implement a single "statewide voter registration list defined, maintained, and administered at the State level." 52 U.S.C. § 21083(a)(1)(A) (emphasis added). To establish a single list, "[t]he *State* shall determine

whether the information provided by an individual is sufficient to meet the requirements" to register to vote. 52 U.S.C. § 21083(a)(5)(A)(iii) (emphasis added). While Congress empowered the states to maintain voter rolls, it also specifically prohibited states from taking actions that could disenfranchise voters. That is why the NVRA explicitly prohibits states from conducting systemic voter list removals in the 90 days before a federal election. *See* 52 U.S.C. § 20507(c)(2)(A).

These requirements, imposed by Congress and implemented through the states, "balance maintaining the integrity of voter rolls with protecting the fundamental right to vote." *Pub. Int. Legal Found., Inc.*, 174 F.4th at 667. Congress, in its considered judgment, declined to give the federal executive the authority it seeks to assert in this lawsuit: the power to compel local officials, on the eve of an election, to effectively purge their voter rolls and set aside lawfully cast ballots based on mere suspicion of non-citizen voting.

Third, California—like the states Amici governed—has established its own mechanisms for enforcing citizenship requirements and adjudicating eligibility disputes, pursuant to its Elections Clause authority. Its state constitution and elections code already limit voter

eligibility to United States citizens who satisfy the other applicable qualifications. *See* Cal. Const., art. II, § 2; Cal. Elec. Code § 2101(a). Those registering to vote must sign citizenship attestations under penalty of perjury. *See* Cal. Elec. Code § 2111. Local officials must cancel the registration of any voter based upon actual "proof" of ineligibility—not unsubstantiated speculation. *See* Cal. Elec. Code § 2201(a)(8).

Moreover, California—like many states—already provides specific procedures for challenging the ballot or registration status of a voter. *See, e.g.*, Cal. Elec. Code § 14240(c) (describing process for adjudicating voter qualification challenges based on third-party information). Notably, California law requires that those challenging mail ballots "have the burden of establishing *extraordinary proof* of the validity of the challenge at the time the challenge is made." Cal. Elec. Code § 15106 (emphasis added). And California's implementing regulations require that "[a]ny doubt in the interpretation of the Elections Code applicable to the challenge shall be resolved in favor of the challenged voter." Cal. Code Regs. tit. 2, § 20879(b). Beyond the individual ballot-challenge process, California's elections code also safeguards against unlawful votes by laying out robust procedures for an election contest, allowing

"any elector of a county, city, or of any political subdivision of either [to] contest any election held therein" on multiple grounds, including "that illegal votes were cast." Cal. Elec. Code § 16100(d).

The federal executive's demands in this lawsuit would supplant these carefully crafted election procedures and force local officials to violate state and federal law. According to the federal government, a federal agency's mere suspicion of unlawful voting would suffice to halt ballot processing, and ballots would remain uncounted—disenfranchising thousands in the process—unless officials affirmatively established a voter's citizenship to the federal executive's satisfaction. While the Department of Justice is authorized to prosecute individual cases of non-citizen voting, *see* 18 U.S.C. § 611, and to enforce provisions of the NVRA and HAVA, *see* 52 U.S.C. §§ 20510(a), 21111, nothing in those statutes (or any other statute) prescribes a competing federal system of voter list maintenance and ballot challenges. As Amici are well aware, those responsibilities belong to the states.

Lastly, Amici understand from experience the confusion—for voters and election officials alike—that could result from last-minute litigation seeking to "alter the election rules on the eve of an election." *Allen v.*

*Milligan*, 608 U.S. 511, 514 (2026); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase."). Yet the federal government has sought to override existing state and federal laws just days before Election Day, while voters are in the midst of casting mail ballots. The Court should not abide this late attempt by the federal executive to usurp the state's authority to administer its elections.

## CONCLUSION

The federal government's requested relief would unconstitutionally interfere with the state's authority to administer elections and profoundly disrupt the principle of electoral federalism at the core of our democracy. For the reasons set forth above, Amici respectfully ask that the Court deny the federal government's request for relief.

DATED: October 29, 2026

*<u>/s/ Carey R. Dunne</u>*
Carey R. Dunne
*Counsel of Record*
Mónica Folch
Stephen Cha-Kim
Zack Goldberg
Martha Reiser
FREE AND FAIR LITIGATION GROUP, INC.
266 W. 37th St., 20th Floor
New York, NY 10018

Andrew J. Rising
Carlos Guevara
Candice Cho
GOVERNORS SAFEGUARDING DEMOCRACY
2300 N. St., NW, Suite 501A
Washington, D.C. 20037

Julia Spiegel
Emily Kirby
Charanya Krishnaswami
Megan Flynn
GOVERNORS ACTION ALLIANCE
2300 N. St., NW, Suite 501A
Washington, D.C. 20037

*Counsel for Bipartisan Former Governors*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-7231

I am the attorney or self-represented party.

**This brief contains** 4402 **words,** including [ ] words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

- ☐ it is a joint brief submitted by separately represented parties.
- ☐ a party or parties are filing a single brief in response to multiple briefs.
- ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [ ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Carey R. Dunne **Date** October 29, 2026

*(use "*s/[typed name]*" to sign electronically-filed documents)*