No. 26-7231

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

STATE OF CALIFORNIA, *et al.*,

*Defendants-Appellees*.

**On Appeal from the United States District Court for the Central District of California**
No. 2:26-cv-12025-DOC-ADS
The Honorable David O. Carter, Judge

# STATE DEFENDANTS' OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
SAMUEL P. SIEGEL
*Supervising Deputy Solicitor General*
SETH E. GOLDSTEIN
*Supervising Deputy Attorney General*
ANNE P. BELLOWS
MICHAEL S. COHEN
LISA C. EHRLICH
ANDREW E. KUSHNER
CHRISTINA M. MCCALL
*Deputy Attorneys General*
MARIAH E. MASTRODIMOS
*Associate Deputy Solicitor General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
300 S. Spring Street
Los Angeles, CA 90013
(213) 269-6693
Samuel.Siegel@doj.ca.gov
*Attorneys for State Defendants*

October 30, 2026

# TABLE OF CONTENTS

**Page**

Introduction ........ 1
Statement ........ 3
Argument ........ 8
I. *Purcell* bars plaintiff's request for an injunction ........ 9
II. Plaintiff is unlikely to succeed on the merits ........ 14
III. Equitable considerations weigh heavily against an injunction ........ 21
Conclusion ........ 25

## INTRODUCTION

Earlier this week, two members of the Court explained why they "would deny the United States's emergency motion for injunctive relief pending appeal." *E.g.*, Bennett Conc. 1. The *Purcell* principle bars relief because "California's election has already begun, and Defendants have rules in place to process vote-by-mail ballots." *Id.* at 23. "Plaintiff's requested remedy would alter those rules." *Id.* And the fact that "these proceedings encroach on the cusp of an election is a delay entirely of the United States' own making." Sanchez Conc. 2.

As to the merits, Judge Bennett explained why plaintiff's preemption theory fails to support an extraordinary injunction pending appeal. "[N]othing in [18 U.S.C. § 611]"—the sole statute invoked by the federal government—"*requires* Defendants to follow Plaintiff's demand to segregate ballots, as § 611 regulates individual voters' conduct, not the states' administration of elections." Bennett Conc. 11. "Because § 611 says nothing about federal referrals, ballot segregation, or citizenship clearance, relabeling Defendants' noncooperation as 'induc[ing], encourag[ing] or promot[ing]' aliens to violate § 611 cannot rewrite the statute to provide Plaintiff's requested relief." *Id.* Indeed, granting the federal government's requested relief would "contravene[] the State's procedures." *Id.* at 14. "California details the exact manner in which a citizenship challenge to a voter

needs to be brought, not only in the days leading up to the election, but all the way through election day and the counting of the votes." *Id.*

In the days since this case last came before the Court, the grounds for denying relief have only grown stronger. We are now even deeper into the ongoing election—and mere days away from Election Day. *Purcell* alone should make plaintiff's request a nonstarter. Plaintiff fails to provide any evidence or arguments that demonstrate otherwise. Very little is new in its latest motion, and none of the new material is convincing:

- The motion invokes "the declaration of Shasta County Registrar Clinton Curtis" for the proposition that the requested ballot-segregation protocol is "manageable." Mot. 16. But Curtis hardly appears to be a reliable source of information.[1] And his feasibility assertions fail for the reasons discussed below, *infra* pp. 12-13.
- Plaintiff's other "supplemental declarations" (Mot. 15-16) failed to persuade the district court that the federal government's verification process is reliable, *infra* pp. 21-22, and there is no basis for this Court to set aside the district court's findings.

---

[1] Marley, *An Election Chief Lost. Then He Padlocked the Ballots & Called the FBI*, Wash. Post. (Oct. 4, 2026), https://tinyurl.com/bde6kcde; Pierce, *Shasta Supervisors Censure Election Official Clint Curtis, Citing Misconduct Against Staff*, Shasta Scout (Aug. 11, 2026), https://tinyurl.com/hbeaup84.

- And the mere fact that elections officials adopted ballot-segregation protocols in other contexts in other States during other elections, *cf. Republican Party of Pa. v. Boockvar*, 592 U.S. 1068, 1070 (2020) (statement of Alito, J.), does not show that ordering plaintiff's requested relief would be feasible, lawful, or equitable, *infra* pp. 11-13.

## STATEMENT

1. California law provides that only citizens may vote in federal elections. *See* Cal. Const. art. II, § 2(a); Cal. Elec. Code §§ 2100, 2101. The State enforces that requirement in several ways, beginning with voter registration. To register to vote, applicants must attest under penalty of perjury that they are U.S. citizens. Cal. Elec. Code §§ 2101, 2102(c), 2111. California has also enacted a comprehensive program for ensuring that the voters listed on its rolls are eligible. *See id.* §§ 2155, 2155.3, 2201, 2220-27. Under that program, elections officials "shall" cancel a voter's registration upon receiving "proof that the person is . . . ineligible to vote," including proof that the person is a noncitizen. *Id.* § 2201(a)(8); *see id.* § 2201(c) (describing the process for canceling registration). In addition, "[a]ny person" may bring an action in superior court to "compel . . . elections official[s] to cancel any registration made illegally or which should have been canceled" because of developments that "occurred subsequent to the

registration." *Id.* § 2213; *see id.* § 2201(a)(4) (mandating cancellation "[u]pon the production of a certified copy of a judgment directing the cancellation to be made").

In addition to these safeguards at the voter-registration stage, California law sets forth a comprehensive statutory framework for the care and handling of ballots sent to and returned by voters. As relevant here, California requires elections officials to begin mailing active registered voters a ballot at least 29 days before an election. Cal. Elec. Code §§ 3001, 4005(a)(8)(A). After filling out the ballot, a voter places it in an envelope, signs it, and returns it. *Id.* §§ 3010(a)(2), 3011(a)(1)-(2).

Once the Registrar receives the ballot, the Registrar verifies the signature by comparing it to the signature in the voter's registration record, and, if the signature is valid, the Registrar separates the ballot from the identification envelope and, on election day, tabulates the vote. Cal. Elec. Code §§ 3019(a)(1), (b), 15101, 15109. Because California law protects ballot secrecy, once a signature is verified and a ballot is separated from its envelope, it is not possible to identify who cast it. Dkt. 32-4 ¶ 18. The only circumstance in which the Registrar may not tabulate a vote (once the signature is verified) is if certain specified individuals contest a voter's eligibility, a process governed by a reticulated set of state and local laws. *See* Cal. Elec. Code §§ 14240, 15104, 15105; Cal. Code Regs. tit. 2, § 20879.

"Because the voter is not present" when a mail ballot is challenged, the challenger must provide "extraordinary proof" of ineligibility "at the time the challenge is made." *Id.* § 15106; *see* Cal. Code Regs. tit. 2, § 20879(a)-(b).

California law also allows "[a]ny elector"—any adult U.S. citizen who is a precinct resident—to contest the result of an election on various grounds, including that "illegal votes were cast." Cal. Elec. Code §§ 321(a), 16100(d). Results for a race in general elections—such as the one currently underway for November 2026—"shall not be set aside" on account of illegal votes "unless it appears that [the] number of illegal votes" affected the results of the election. *Id.* § 16203. And California imposes criminal penalties for unlawful conduct related to voter registration and voter fraud. *Id.* §§ 18100(a), 18500, 18560(a), 18561(a).

2. California's approach to verifying citizenship is consistent with federal law, as well as the procedure used in most States. Under the National Voter Registration Act of 1993 (NVRA), States must "accept and use a standard federal registration form," which requires an "attestation, subscribed to under penalty of perjury," that the applicant "meets the State's voting requirements (including [any] citizenship requirement)." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 5, 6-7 (2013) (*ITCA*); *see also* 52 U.S.C. §§ 20508(b)(2), 21083(b)(4)(A)(i). California has implemented these requirements. Cal. Elec. Code §§ 2101, 2102(c), 2111, 2150(a)(1), 2264(a)(3), (b). Over 40 States verify

citizenship by requiring attestation upon registration. *See Voter Registration & Citizenship*, Nat'l Conf. of State Legislatures (May 21, 2026), https://tinyurl.com/ymwxeksm.

No federal statute prescribes the manner in which a State must verify voter eligibility (including citizenship) once it receives a voter's ballot. On the contrary, Congress has repeatedly declined to impose additional citizenship verification procedures. *See* S.B. 1383, 119th Cong. (2025-2026), https://tinyurl.com/34dpwhk8 (SAVE Act). Congress has, however, made it a misdemeanor for individual noncitizens to "vote in any election held solely or in part for the purpose of electing" federal officials, with certain exceptions. 18 U.S.C. § 611(a).

3. On July 16, 2026, the Department of Homeland Security (DHS) sent a letter to California Secretary of State Weber, claiming that there "may be as many as 190,832 non-citizens registered to vote in California." Dkt. 1-1 at 2. The letter did not explain DHS's process for identifying the alleged noncitizens or how DHS obtained the underlying data. Secretary Weber promptly responded, expressing concern about the accuracy of DHS's claims and requesting additional information in writing. Dkt. 1-2 at 2. DHS did not provide the requested information.

On October 13, three months after initially reaching out to the State, the U.S. Department of Justice sent the Los Angeles County Registrar a thumb drive with a statewide "list of names of people the Federal Government believes are likely

noncitizens who were sent a vote-by-mail ballot," and asked him to "segregate" those persons' ballots "until their citizenship status can be determined." Dkt. 1-4 at 1. It sent a similar letter to Secretary Weber. Dkt. 1-3. The letters demanded that the Secretary and the Registrar "review the list within 48 hours" to verify each person's citizenship. *Id.* at 2; Dkt. 1-4 at 2. In response, Secretary Weber and the Registrar raised concerns about the reliability of the federal government's data, requested proof of noncitizenship, and stated they would continue to administer the election consistent with federal and state law. Dkts. 31-2, 32-2.

Less than 48 hours after sending the letter, the United States filed this lawsuit against California, Secretary Weber, and the Registrar and sought a temporary restraining order several days afterwards. Dkts. 1, 22-2. When the district court did not rule by plaintiff's requested deadline, it appealed and sought emergency relief from this Court. Opn. 6. This Court dismissed the appeal for lack of jurisdiction on October 26. Opn. 2. The district court held a hearing on the TRO application and denied it on October 28. Dkt. 149. "Given the vagueness of Plaintiff's descriptions of its procedures and the unreliability of its similar claims in other states," the court explained that it could not "conclude that Plaintiff's process is credible." *Id.* at 22. It also found that plaintiff's "requested relief would create a significant administrative burden for Defendants, leading to chaos and

upending the election." *Id.* And it concluded that granting the TRO would "risk disenfranchising an untold number of voters." *Id.* at 24.

Plaintiff immediately filed an appeal, Dkt. 152, and now again seeks an injunction pending appeal. The district court has set a hearing on plaintiff's motion for a preliminary junction for November 13. Dkt. 159.

While the litigation was ongoing, USDOJ sent letters similar to the one it sent to the Registrar to elections officials in each of California's 58 counties, demanding that they evaluate lists of alleged noncitizens within 48 hours and segregate their ballots, or risk prosecution. *See* Dkt. 97-1 ¶¶ 5-8; Rosenhall & Hubler, *Justice Dept. Demands That California Counties Help Identify Noncitizen Voters*, N.Y. Times (Oct. 23, 2026), https://perma.cc/64ZX-L9T8. It made a similar demand of the State of Washington. *See Washington Secretary of State Steve Hobbs Response to DOJ Letter About Voter Rolls*, Wash. Sec'y of State (Oct. 28, 2026), https://perma.cc/633L-KCMJ. Preliminary reports indicated that those lists were compiled using the same flawed process as here and that they were also riddled with errors. *Infra* p. 22.

## ARGUMENT

Denials of TROs are not appealable unless "the circumstances render the denial tantamount to the denial of a preliminary injunction." *Babaria v. Blinken*, 87 F.4th 963, 975 (9th Cir. 2023). Although this Court has sometimes deemed that

standard satisfied when presented with "extraordinary circumstances," *e.g.*, *Washington v. Trump*, 847 F.3d 1151, 1158 (9th Cir. 2017), no such circumstances exist here. Plaintiff asserts that this appeal involves an "emergency," Mot. 15, but the Court previously concluded that plaintiff's "claimed emergency, at least in part, is a self-constructed one," Opn. 15. If, however, the Court concludes that it has jurisdiction, it should deny an injunction pending appeal. To obtain such relief, the movant "must establish that the law and facts *clearly favor* its position." Bennett Conc. 6. "And in deciding to grant equitable relief, the remedy must be workable," "necessary," and "fair." *Id.* at 6, 21.

## I. *PURCELL* BARS PLAINTIFF'S REQUEST FOR AN INJUNCTION

This Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Scanlan v. Coalition for Open Democracy*, 2026 WL 3167846, *1 (Oct. 22, 2026); *see Purcell v. Gonzalez*, 549 U.S. 1, 4-5, (2006). As Judges Bennett and Sanchez have already recognized, *Purcell* resolves plaintiff's request. *See* Bennett Conc. 23-25; Sanchez Conc. 6-14. As required by California law, *see* Cal. Elec. Code §§ 3001, 4005(a)(8)(A), the County mailed approximately 5.9 million vote-by-mail ballots to active registered voters weeks ago, Dkt. 32-4 ¶¶ 24, 37. Once a vote-by-mail ballot is received, the Registrar verifies the signature on its envelope, and, if the signature is valid, removes the ballot and, on election day, tabulates the vote.

*Supra* p. 4. As of 6 days ago, the Registrar had completed this process for approximately 550,000 voters. C.A. No. 26-7070, Dkt. 32.1 at 2 n.*. Under state law, the only circumstance in which the Registrar may not tabulate the vote (once the signature is verified) is if a specified person contests a voter's eligibility, *supra* pp. 4-5, based on "extraordinary proof" presented "at the time the challenge is made" that the person who cast the vote is ineligible, Cal. Elec. Code § 15106.

Yet now—with voting already underway—plaintiff seeks a court order bypassing that state scheme and imposing new elections procedures for up to 20,000 votes. That would plainly "alter the election rules of a state on the eve of an election"; indeed, it would "usher in electoral chaos." *People Not Politicians v. Onder*, 2026 WL 2883222, *2 (Sept. 25, 2026). There could be no clearer case for the application of *Purcell*: "California's election has already begun, and Defendants have rules in place to process vote-by-mail ballots. Plaintiff's requested remedy would alter those rules during the election[.]" Bennett Conc. 23; *see also* Sanchez Conc. 1 (same).

In addition, and as the district court found, the requested injunction would "create a significant administrative burden for Defendants, leading to chaos and upending the election." Dkt. 149 at 22. Segregating ballots would be a logistical and administrative nightmare: plaintiff's list does not contain the information necessary to identify voters; the Registrar has no established system for

segregating ballots; and trying to create one now risks shutting down the system the Registrar needs to run the entire election. *See* Dkts. 32-3 ¶¶ 11, 16-17, 20; 32-4 ¶¶ 39-44. It is also not possible to segregate ballots already tabulated: to preserve the right to a secret ballot, once the signature verification process is complete, the Registrar separates the ballot from its envelope, and there is no way to identify which voter cast it. Dkt. 32-4 ¶ 18. As the top official charged with running the County's elections has concluded, it "would be virtually impossible to timely certify the election results in compliance with state law" if the requested injunction was granted. *Id.* ¶ 3; *see also* Sanchez Conc. 10-12 (explaining how the injunction would "greatly alter California's election rules and procedures").

Plaintiff attempts to limit *Purcell* to cases in which an injunction would "result in voter confusion." Mot. 38. That attempt fails: as Judge Sanchez explained, *Purcell* is meant to avoid voter confusion and "prevents judicially created changes that 'would usher in electoral chaos' and 'disorder.'" Sanchez Conc. 7 (quoting *Onder*, 2026 WL 288322, at *2); *see also id.* at 7-9 (explaining how *Onder* shows that *Purcell* "demonstrates these twin interests"). And plaintiff is wrong that the order it seeks here is "narrowly defined" and "would not affect voters or candidates at all." Mot. 38. On the contrary, its process *would prevent duly cast ballots from being counted*. *See* Dkt. 149 at 24.

Plaintiff is also wrong that the order entered by Justice Alito requiring the segregation of ballots in another case shows that such an order would be "feasible" here. Mot. 39. In that matter, the Pennsylvania Secretary of State had issued guidance "directing county boards of elections to segregate ballots" received after Election Day. *Boockvar*, 592 U.S. at 1070-71 (statement of Alito, J.); *see also Roe v. State of Ala. by & through Evans*, 43 F.3d 574, 577-78, 583 (11th Cir. 1995) (allowing State to *continue* segregating ballots that State deemed defective). Here, by contrast, elections officials have never implemented the segregation-and-verification process that plaintiff requests; nor could they before Election Day. *See* Dkt. 149 at 23.

Plaintiff's assertion that the requested "ballot segregation" processes are "manageable," Mot. 16, is both legally irrelevant and wrong. Even if some ballot segregation process could theoretically be administered, nothing in California's elections laws would allow an elections official to take a list generated by a third party and then "manually issu[e] a new ballot that is not sent to the voter and mark[] their old ballot as void" based on a "reasonabl[e] belie[f]" standard found nowhere in state elections statutes, in the middle of an election. *Id.* at 21, 22, 34. And despite what a Shasta County official says about his experience with a system used to administer elections there, *id.* at 16, the district court credited the declarations of Los Angeles County officials that the technological changes

required to implement a new segregation-and-verification system "cannot be completed safely and uniformly before Election Day." Dkt. 149 at 23. Because the county Registrar's current system "ha[s] no function for setting aside the ballots of designated voters," complying with plaintiff's request would require "changes to systems and procedures that have already been tested and finalized for this election, the development and documentation of a new process, and the training of staff on it." *Id.* at 23 (quoting Dkt. 32-4 ¶ 43). This would also require updates to "multiple, separate software programs and hardware devices." *Id.* (quoting Dkt. 32-3 ¶ 11). Initiating such processes during the election period would have "downstream effects on other election functions," such as the tabulation of ballots and would thus "impede the administration of the election for all voters." *Id.* (quoting Dkt. 32-3 ¶ 15).[2]

[2] Plaintiff is also wrong that California has a "system[] in place" under California Code of Regulations section 20363 to segregate ballots of suspected noncitizens. Mot. 39. That segregation process involves recounts of ballots after the end of an official canvass, meaning that the ballots (with the exception of any rejected or provisional ballots) have already been separated from their envelopes and cannot be matched to any particular voter. *See* Bennett Conc. 22 (process under section 20363 "provides no guidance on *how* elections officials would be able to segregate or 'flag'" ballots and attempting to implement it could be "'potentially catastrophic'").

## II. Plaintiff Is Unlikely to Succeed on the Merits

Plaintiff also lacks standing, a cause of action, and a viable theory on the merits. *See* Dkt. 149 at 9-13.[3] The Elections Clause provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. In practice, the Clause functions as "a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to pre-empt state legislative choices." *ITCA*, 570 U.S. at 9. The Clause gives States "authority to provide a complete code for congressional elections." *Smiley v. Holm*, 285 U.S. 355, 366 (1932).

Congress "may supplement these state regulations or substitute its own." *Smiley*, 285 U.S. at 366-67. But Congress's power over the times, places, and manner of congressional elections extends only "so far as it is exercised, and no farther." *ITCA*, 570 U.S. at 9; *see also Watson v. Republican Nat'l Comm.*, 609 U.S. 672, 697 (2026). And as Judge Bennett correctly observed, "the Elections

[3] Plaintiff incorporates by reference its prior arguments on standing and equitable relief. Mot. 24. State defendants take the same approach and incorporate by reference the arguments establishing that plaintiff lacks standing and a cause of action. C.A. No. 26-7070, Dkt. 30.1 at 8-12.

Clause confers broad authority only on Congress and the States, not the Executive," which avoids "centralization of election management in the Executive." Bennett Conc. 8-9.

California has exercised its broad authority by specifying that only citizens may vote in congressional elections and by regulating the times, places, and manner of holding them. In particular, "California details the exact manner in which a citizenship challenge to a voter needs to be brought, not only in the days leading up to the election, but all the way through election day and the counting of the votes." Bennett Conc. 14. At the time of registration, California requires each voter to "prove he or she is a citizen" by attesting to citizenship under oath. Cal. Elec. Code § 2111; *accord* 52 U.S.C. § 20508(b)(2). If elections officials receive proof that a person registered to vote is a noncitizen, they "shall cancel the registration." Cal. Elec. Code § 2201(a)(8), (c). "Any person" may bring an action in superior court to compel elections officials to cancel the registration of a person who is ineligible to vote. *Id.* § 2213; *see also id.* § 2201(a)(4).

In addition to voter-registration challenges, California allows challenges to the eligibility of voters at the time of voting. For instance, a "person offering to vote may be orally challenged within the polling place" by a member of the precinct board on the ground that "the voter is not a citizen of the United States." Cal. Elec. Code § 14240(a)(3). With respect to vote-by-mail ballots, certain

specified individuals may contest a voter's eligibility, including on the basis that the voter is not a citizen. *Id.* §§ 14240, 15104, 15105. "All challenges shall be made prior to the opening of the identification envelope of the challenged vote by mail voter." *Id.* § 15105. "Because the voter is not present," the challenger must provide "extraordinary proof" of ineligibility "at the time the challenge is made." *Id.* § 15106; *see also* Cal. Code Regs. tit. 2, § 20879(a)-(b).

By contrast, "Congress has not exercised the specific power granted to it under the Elections Clause to override the decisions of the California Legislature on how to remove ineligible voters from California's voter rolls" or process ballots in the midst of an election. Bennett Conc. 13. Indeed, although there has been vigorous political debate about whether Congress should impose additional citizenship verification requirements, Congress has so far declined to enact them. *Supra* p. 6. As a result, under the Elections Clause, the California "legislature's statutory scheme remains as the only method to do so." Bennett Conc. 13.

Section 611, plaintiff argues, preempts that scheme by imposing an affirmative requirement to segregate mail ballots and "verify the citizenship" of registered voters identified by the federal government to be "likely noncitizens." Mot. 27-28. But "[s]ection 611 is a federal misdemeanor statute that sets forth criminal punishments for non-citizens who vote illegally." Dkt. 149 at 15. Subject to certain exceptions, section 611 makes it a misdemeanor for "any alien to vote in

any" federal election. 18 U.S.C. § 611(a)-(b). "Notably absent from the statute is any express preemption provision; language setting forth standards for election administration that might, explicitly or implicitly, prohibit a state from mailing and tabulating ballots; or text regulating how a state deals with challenges to ballots." Bennett Conc. 10. Its text "reveals no hidden provision authorizing [USDOJ] to superintend or intervene in a state's election administration." *Id.*; Dkt. 149 at 15. The statute thus "neither conflicts with nor preemptively extends to" the State's "actions of sending vote-by-mail ballots, tabulating them on their return, or dealing with challenges to particular ballots." Bennett Conc. 10-11.

If there were any doubt, the Supreme Court "typically greet[s] assertions" of extravagant power with "skepticism." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 724 (2022). There is no question that plaintiff's claimed authority implicates a question of extraordinary "'political significance.'" *Biden v. Nebraska*, 600 U.S. 477, 502 (2023); *cf. Bost v. Ill. Bd. of Elections,* 607 U.S. 71, 77 (2026) ("electoral process" is "'of the most fundamental significance under our constitutional structure'"). It also arrogates to the Executive authority that Congress has declined to grant, *see Biden*, 600 U.S. at 503, and would upset the "usual constitutional balance between the States and the Federal Government," *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991). It is thus no surprise that there is no "historical precedent" for "the breadth of authority that the [Executive Branch] now claims," "a telling

indication that the [claimed authority] extends beyond the agency's legitimate reach." *NFIB v. OSHA*, 595 U.S. 109, 119 (2022). Indeed, "[n]ever before in American history has the federal government, on the eve of an election, sought to coerce a State and local government to abandon their own Constitutional elections procedures" by invoking a misdemeanor provision that has been on the books for three decades. Dkt. 149 at 2.

Plaintiff argues that California "knowingly facilitate[s]" violations of the statute by processing ballots in accordance with state law and declining to adopt the federal government's requested approach to voter-eligibility verification. Mot. 27. That is not a valid preemption argument, but an improper effort to impose new obligations on elections officials that Congress has never enacted.[4] Plaintiff's related argument that it "does not challenge California *state law*" but instead challenges "*state action*," Mot. 30, makes no sense. California law sets procedures that elections officials must follow, and plaintiff does not dispute that California officials are following state law. Plaintiff's quarrel, then, is unambiguously with the scope of California's election laws.

Plaintiff's obstacle preemption theory (Mot. 29) also fails under settled precedent. "The possibility that federal enforcement priorities might be upset is

[4] Plaintiff's factual premise is also flatly wrong: California law prohibits voting by noncitizens; it does not "knowingly" encourage such voting in any way.

not enough to provide a basis for preemption." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020). And the federal government is hardly "powerless" (Mot. 31) to enforce section 611 without the State's affirmative cooperation. Indeed, plaintiff has emphasized that it has brought criminal charges against some 28 alleged noncitizens. Mot. 10-11.

At bottom, plaintiff's preemption theory amounts to the view that the Executive Branch may demand that States "cooperate with the United States" to prevent violations of federal criminal laws. Mot. 21. But the federal government cannot "commandeer" States "to address particular problems," or "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 929, 935 (1997). As this Court has emphasized, "refusing to help is not the same as impeding," and is no basis for a preemption claim. *United States v. California*, 921 F.3d 865, 888 (9th Cir. 2019).

Plaintiff argues that the anti-commandeering doctrine does not apply to legislation adopted under the Elections Clause. Mot. 35. But as relevant here, section 611 is not Elections Clause legislation: it "prescrib[es] vot[er] qualifications," and "[p]rescribing voting qualifications . . . 'forms *no part* of the power to be conferred upon the national government' by the Elections Clause."

*ITCA*, 570 U.S. at 17 (emphasis added).[5] In response, plaintiff points to a portion of section 611 that regulates elections in which States allow noncitizens to vote for "some . . . purpose[s]." 18 U.S.C. § 611(a). *See* Mot. 30 n.2. But that portion of section 611 is irrelevant here. The only portion at issue is the bar on noncitizen voting, which is plainly a voter-qualification restriction.

Finally, granting the requested relief would violate multiple state and federal laws, as the district court explained. *See* Dkt. 149 at 17-20. Among other things, it would contravene: the NVRA's prohibition on any state "program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" in the 90 days leading up to an election, 52 U.S.C. § 20507(c)(2), *see* Bennett Conc. 16-18; the Voting Rights Act's command that "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is . . . qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote," 52 § U.S.C. 10307(a); and the Constitution's protections of the right to vote, *see Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

---

[5] For that reason, a federal district court recently held that section 611 is unconstitutional. *United States v. Cox*, 2026 WL 2948729, *10-*12 (S.D. Fla. 2026). While the Court need not reach that question if it concludes that plaintiff's preemption theory fails for the reasons discussed above, the Court would be forced to confront the question if it otherwise embraced plaintiff's preemption theory.

## III. Equitable Considerations Weigh Heavily Against an Injunction

The "equities between the parties and the public's interest do not weigh in favor of granting the requested relief." Bennett Conc. 22. Plaintiff asserts that it is irreparably harmed if noncitizens vote. Mot. 40. But any such harm is "tempered by California's established process for ensuring voter eligibility." Bennett Conc. 18. And the district court concluded that plaintiff's evidence is "not credible." Dkt. 149 at 21. It relies on a list of some 20,000 individuals whom it "believes are noncitizens registered to participate in the federal election." Mot. 21. DHS officials received what "appeared to be the California voter roster . . . *as of August 2025*." Dkt. 22-3 ¶¶ 20-21 (emphasis added). Officials then "enhanc[ed]" that data using a "third-party analytics and investigative platform"—LexisNexis's Accurint—and "paired" that data with "an internal USCIS alien number that *may* be the same individual." Dkts. 22-4 ¶ 16, 107-2 ¶ 15 (emphasis added). Next, DHS "screen[ed] all potential matches against Department of State and Social Security Administration data," before using an undefined process to "assign[] a confidence level for each match." Dkt. 22-4 ¶¶ 17-20.

As the district court found, that "protocol" raises "significant concerns." Dkt. 149 at 21. For example, plaintiff failed to disclose "the specific matching rules, the specific criteria for its confidence thresholds, [or] any detailed information about the third-party platform and their procedures." *Id.* Plaintiff "did not explain what

its 'enrichment process' entailed or how it occurred." *Id.* at 22. Plaintiff also provided "no error rates" or "validation against a reliable benchmark" that would enable a determination of the accuracy of its findings. *Id.* And "[o]missions of this critical information," the district court concluded, "prevent an evaluation of Plaintiff's procedure, including how Plaintiff reduced its initial claim of nearly 200,000 alleged noncitizens to 20,000 individuals." *Id.*

Letters with similar allegations sent last week to counties across California and the State of Washington have also been riddled with errors. Plaintiff appears to have relied on the same list invoked here to identify purported noncitizen voters on the rolls of other California counties. *See* Dkt. 97-1 ¶ 4 and pp. 15-16, 29-43, 45-62, 66-84. But elections officials have already concluded that the lists they were provided were "completely wrong" and contained only persons who were from another county, or included only people who had never been issued a ballot, or who did not have active voter registrations. *See* Rosenhall & Hubler, *supra*. In Washington, the Secretary of State concluded that the list of alleged noncitizen voters was "not reliable" and included a large number of people who were either not registered or on inactive status. Wash. Sec'y of State, *supra*.

Plaintiff's efforts to rehabilitate its evidence fail. It now asserts for the first time that the list it received "from the California Secretary of State" was "the California voter roster for the *general election of 2026*." Mot. 20 (emphasis

added). But the relevant declaration makes clear that DHS officials received the roster from a private party "as of August 2025." Dkt. 22-3 ¶¶ 20-21. Consistent with the NVRA, California routinely updates its voter rolls; as a result, any voter roll received 15 months before the November 2026 general election would be woefully out of date. Indeed, during the two-year period running from November 2022 to November 2024, California removed over 3.1 million voter records from its rolls. U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* 185, https://tinyurl.com/yfadd6jd. Assuming a similar rate of removal from 2025 to 2026 would mean that some 1.5 million voter records have been removed from California's voter roll since plaintiff obtained the roster that it used to compile its list of suspected noncitizen voters.

Plaintiff also argues that California "intends to tabulate vote-by-mail-ballots received by noncitizens whom the United States has charged with having already violated federal election law." Mot. 28. Plaintiff cannot substantiate that claim. Although this information is not in the record, the State has conducted a manual review in recent days—specifically, on October 20, 25, and 29—of the statewide database reflecting voter-participation history. That search confirms that none of the 28 charged individuals has voted in the November 2026 election.

While plaintiff has not substantiated its allegations of harm, the harm of the requested injunction to California and registered voters would be extraordinary.

An order requiring the Registrar to segregate and not tabulate votes would likely deny voting rights to as many as 20,000 people, each of whom attested to their eligibility under penalty of perjury. Dkt. 149 at 24. The requested relief would also undermine voters' faith in the integrity of the State's elections by signaling that their votes can be discarded based on little more than plaintiff's vague assertions. As the district court observed, "[e]roded trust in our democracy is irreparable. Once a vote is segregated, lasting harm has occurred. If the Executive can discount votes and threaten an ongoing election due to unproven allegations, then our democracy is in danger." *Id.* at 25. This Court should "decline[] to be a party to such process." *Id.*

## CONCLUSION

The application for an injunction pending appeal should be denied.

Dated: October 30, 2026

Respectfully submitted,

*/s/ Samuel P. Siegel*

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
SAMUEL P. SIEGEL
*Supervising Deputy Solicitor General*
SETH E. GOLDSTEIN
*Supervising Deputy Attorney General*
ANNE P. BELLOWS
MICHAEL S. COHEN
LISA C. EHRLICH
ANDREW E. KUSHNER
CHRISTINA M. MCCALL
*Deputy Attorneys General*
MARIAH E. MASTRODIMOS
*Associate Deputy Solicitor General*

*Attorneys for the State Defendants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(d) and 32-3 because it contains 5,585 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in Times New Roman 14-point font.

*/s/ Samuel P. Siegel*

SAMUEL P. SIEGEL
*Supervising Deputy Solicitor General*