No. 26-7231

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

SERVICES, IMMIGRANT RIGHTS AND EDUCATION NETWORK, *et al.*,

*Intervenors-Appellees*,

STATE OF CALIFORNIA, *et al.*,

*Defendants-Appellees*.

On Appeal from the United States District Court for the
Central District of California
No. 2:26-cv-12025-DOC
Hon. David O. Carter

# INTERVENORS SIREN AND MI FAMILIA EN ACCIÓN'S RESPONSE IN OPPOSITION TO EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

Tyler L. Bishop
**ELIAS LAW GROUP LLP**
1700 Seventh Ave., Ste. 2100
Seattle, WA 98101
Tel.: (206) 656-0177

Uzoma N. Nkwonta
Branden D. Lewiston
Robert Golan-Vilella
Julianna D. Astarita
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Ste. 400
Washington, DC 20001
Tel.: (202) 948-1135
unkwonta@elias.law

*Counsel for Intervenors-Appellees SIREN and MFA*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 3

I. The federal government seeks to upend California's election based on a list derived from error-prone database matching. ........ 3

II. DOJ brings suit, files a first appeal that is dismissed, and then has its application for a temporary restraining order denied. ........ 6

LEGAL STANDARD ........ 7

ARGUMENT ........ 8

I. DOJ's suit comes too late, and *Purcell* bars the relief it seeks. ........ 8

II. DOJ has not shown a likelihood of success. ........ 11

A. Federal law does not preempt California's procedures for determining voter eligibility. ........ 12

B. The NVRA, the Voting Rights Act, and the Civil Rights Act bar DOJ's requested relief. ........ 19

III. DOJ will not suffer irreparable harm absent an injunction. ........ 21

IV. The balance of equities and the public interest foreclose an injunction. ........ 24

CONCLUSION ........ 25

CERTIFICATE OF COMPLIANCE ........ 27

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Allen v. Milligan*,
608 U.S. 511 (2026) ....................................................................1, 8

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) ..............................................................2, 14, 15, 20

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015)...........................................................................17

*Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*,
56 F.3d 791 (7th Cir. 1995)..................................................................20

*Brown v. Washington Interscholastic Activities Ass'n*,
--- F.4th ----, No. 26-5488, 2026 WL 2891827 (9th Cir.
Sep. 25, 2026) ....................................................................................... 8

*Common Cause v. U.S. Dep't of Just.*,
No. 1:26-cv-1352, 2026 WL 3033772 (D.D.C. Oct. 9, 2026)............... 4

*DNC v. Wis. State Legislature*,
592 U.S. 1039 (2020) ....................................................................... 9, 10

*Doe v. S.D. Unified Sch. Dist.*,
19 F.4th 1173 (9th Cir. 2021)................................................................ 7

*Estill v. Cool*,
295 F. App'x 25 (6th Cir. 2008)........................................................... 25

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015)................................................................. 8

*INS v. Pangilinan*,
486 U.S. 875 (1988) ..............................................................................19

*Kansas v. Garcia*,
589 U.S. 191 (2020) ........................................................................ 15, 16

*League of Women Voters of N.C. v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) .......................................................... 25

*Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012) .......................................................... 25

*Merrill v. Milligan*,
142 S. Ct. 879 (2022) ........................................................................ 9

*Mi Familia Vota v. Fontes*,
129 F.4th 691 (9th Cir. 2025)................................................. 15, 19-21

*Norwood v. Harrison*,
413 U.S. 455 (1973) ............................................................... 16, 17

*People Not Politicians v. Onder*,
No. 26A388, 2026 WL 2883222 (U.S. Sep. 25, 2026)............... 1, 8-10

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) ............................................................................ 8

*Republican Party of Pa. v. Boockvar*,
592 U.S. 1068 (2020)...................................................................... 11

*RNC v. DNC*,
589 U.S. 423 (2020) ........................................................................ 9

*RNC v. Mi Familia Vota*,
146 S. Ct. 2799 (2026) ....................................................................15

*RNC v. Mi Familia Vota*,
145 S. Ct. 108 (2024)......................................................................15

*Shah v. United States*,
878 F.2d 1156 (9th Cir. 1989) ......................................................... 23

*Smiley v. Holm*,
285 U.S. 355 (1932).........................................................................14

*United States v. California*,
921 F.3d 865 (9th Cir. 2019)...........................................................16

*United States v. California*,
No. 26-7070, 2026 WL 3212945 (9th Cir. Oct. 26, 2026) .... 6-8, 10, 12

*United States v. Cox*,
No. 0:25-cr-60249, 2026 WL 2948729 (S.D. Fla. Oct. 1, 2026)........ 18

*United States v. Jalas*,
409 F.2d 358 (7th Cir. 1969) ........................................................17

*United States v. Mattson*,
600 F.2d 1295 (9th Cir. 1979)........................................................17

*United States v. Metcalf*,
156 F.4th 871 (9th Cir. 2025)........................................................ 18

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ...................................................................... 18

*Watson v. RNC*,
609 U.S. 672 (2026)........................................................................15

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001)........................................................................19

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..........................................................................21

**STATUTES**

18 U.S.C. § 611.......................................................................... 2, 13, 17

52 U.S.C. § 10101 ..........................................................................21

52 U.S.C. § 10307..........................................................................20

52 U.S.C. § 20507 ...................................................................... 19, 20

52 U.S.C. § 20508..........................................................................14

Cal. Elec. Code § 2101 ....................................................................12

Cal. Elec. Code § 2111.....................................................................12

Cal. Elec. Code § 2201 .......... 12

Cal. Elec. Code § 14240 .......... 12

Cal. Elec. Code § 15106 .......... 13

Cal. Elec. Code § 18560 .......... 12

**OTHER AUTHORITIES**

Jack Friedman & Wren Orey, *Evaluating How the USCIS SAVE System Performs in Practice: Evidence from Election Offices*, MIT Election Lab (Oct. 1, 2026), https://perma.cc/YCB4-5XR9 .......... 5

Katherine Schaeffer, *One in Ten Eligible Voters in the U.S. Are Naturalized Citizens*, Pew Rsch. Ctr. (Sep. 19, 2019), https://perma.cc/2G59-7XB7 .......... 24

Letter from Anonymous Whistleblower to Alex Padilla, U.S. Senator (Sep. 8, 2026), https://perma.cc/J3D3-GLDF .......... 5

Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sep. 24, 2026), https://www.nytimes.com/2026/09/24/us/politics/nevada-voters-homeland-security-trump.html .......... 4

## INTRODUCTION

The U.S. Department of Justice's latest "emergency" motion is legally baseless, factually unsupported, and far too late to allow for any relief. Its motion is grounded on the premise that California election officials' processing of mail ballots in the ordinary course, pursuant to state law, is somehow a dire emergency that merits this Court's immediate intervention. DOJ has demanded—five days before Election Day—an injunction requiring California to segregate and not count ballots from more than 20,000 registered voters until their citizenship is "verified" through some unspecified and nonexistent process.

Black-letter law makes clear that this unprecedented request must be denied. The Supreme Court has explicitly and repeatedly directed that courts should not "alter the election rules on the eve of an election." *Allen v. Milligan*, 608 U.S. 511, 514 (2026) (per curiam) (citation omitted). And this principle "applies with even greater force here" because "[t]he election is not merely upcoming; it has already started." *People Not Politicians v. Onder*, No. 26A388, 2026 WL 2883222, at *2 (U.S. Sep. 25, 2026) (per curiam). That alone forecloses DOJ's demand.

DOJ's claim is also meritless. The Elections Clause "invests the States with responsibility for the mechanics of congressional elections," subject

only to Congress's power to preempt. *Arizona v. Inter Tribal Council of Ariz., Inc.* ("*ITCA*"), 570 U.S. 1, 9 (2013) (quoting *Foster v. Love*, 522 U.S. 67, 69 (1997)). California has established a comprehensive election code that includes a framework for bringing and assessing challenges to a voter's eligibility. DOJ seeks to supplant that process with a different, unspecified citizenship-verification regime, but no federal law authorizes this power grab. The only statute DOJ invokes—18 U.S.C. § 611—makes it a crime for a noncitizen to vote in a federal election but says *nothing* about the obligations of state and local election officials. Since Congress's power to preempt extends only "so far as it is exercised, and no farther," *ITCA*, 570 U.S. at 9 (citation omitted), § 611 provides no support for DOJ's preemption claim. In fact, numerous federal laws prohibit just what DOJ now demands.

DOJ's motion also fails because its theory of irreparable harm depends entirely on its unsupported speculation that noncitizens are voting in California's election, an allegation the district court found not credible after carefully considering extensive briefing, numerous declarations and expert reports, and holding a hearing on an expedited basis. Order Den. T.R.O. at 21-22, ECF 149 ("Order"). In contrast, granting DOJ the relief it seeks would throw California's elections into chaos—there is simply no way to create from scratch a process that would do what DOJ demands just days before an

election, while voting is already underway, without risking disenfranchising thousands of eligible voters and causing a catastrophic failure in the State's election administration.

DOJ's motion for an injunction pending appeal should be denied.

## BACKGROUND

### I. The federal government seeks to upend California's election based on a list derived from error-prone database matching.

On July 16, 2026, Secretary of Homeland Security Markwayne Mullin sent California Secretary of State Shirley Weber a letter alleging that there may be "as many as 190,832" noncitizens registered to vote in California. ECF 1-1 at 2 (emphasis omitted).[1] Secretary Weber responded on July 23, requesting "[a] detailed description of the methodology utilized by DHS." ECF 1-2 at 2. DOJ never responded. Then, on October 13, just three weeks before the November 3 election, DOJ sent the Los Angeles County Registrar-Recorder/County Clerk ("Los Angeles County") a list of more than 20,000 registered voters and an ultimatum. DOJ alleged that the individuals on the list are "likely noncitizens" and demanded that Los Angeles County (1) "confirm" the voters' citizenship within 48 hours; (2) refuse to send ballots to anyone on the list until their citizenship is "confirmed";

[1] All "ECF" citations are to the district court docket.

(3) "segregate[]" any ballots those voters return; and (4) not tabulate ballots already returned "until citizenship can be determined." *See* Compl. ¶ 47, ECF 1; ECF 1-3.

Everything known about how the federal government has been generating lists of purported "noncitizens" indicates that DOJ's list sweeps in eligible voters. A federal court recently found that DOJ has "failed to consider the risk that its use of citizenship records known to be unreliable would lead [it] to demand that states remove U.S. citizens from their voter rolls." *Common Cause v. U.S. Dep't of Just.*, No. 1:26-cv-1352, 2026 WL 3033772, at *8 (D.D.C. Oct. 9, 2026). Earlier this year, DHS told Nevada that federal records showed the State may have nearly 16,000 noncitizens on its rolls, but when pressed, DHS cut the number to 185.[2] Even that pared-down figure quickly unraveled as Nevada election officials confirmed that all 185 individuals were citizens.[3] Similarly, a Utah audit found that, of 8,917 individuals flagged as "potential noncitizens" by the federal government,

---

[2] Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sep. 24, 2026), https://www.nytimes.com/2026/09/24/us/politics/nevada-voters-homeland-security-trump.html.

[3] *See id.*; *see also* Order 6.

nearly all were citizens.[4]

The same pattern is unfolding in California. Secretary Mullin's initial letter to Secretary Weber indicated that there could be "as many as 190,832 non-citizens" registered to vote, *see* ECF 1-1 at 2; that number has since plummeted to 20,000. *See* Compl. ¶ 47. Initial analysis by Los Angeles County confirms that even this reduced list is riddled with errors: 25.8% of voters in a sample analyzed by the County listed their birthplace as the United States, 42.9% already had their registrations canceled, and another 4.6% had registrations listed as inactive. *See* ECF 32-1 at 17.

Finally, a federal whistleblower has described the troubling processes that likely produced DOJ's list. Officers working for DHS's "Unlawful Voter Initiative" were given less than two hours of training, quotas of reviewing records for 40 voters a day (about 12 minutes each), and unreliable data that likely included naturalized citizens; officials described the data as compiled with "supplemental magic."[5]

---

[4] Jack Friedman & Wren Orey, *Evaluating How the USCIS SAVE System Performs in Practice: Evidence from Election Offices*, MIT Election Lab (Oct. 1, 2026), https://perma.cc/YCB4-5XR9.

[5] *See* Letter from Anonymous Whistleblower to Alex Padilla, U.S. Senator, at 30, 39-40 (Sep. 8, 2026), https://perma.cc/J3D3-GLDF.

## II. DOJ brings suit, files a first appeal that is dismissed, and then has its application for a temporary restraining order denied.

DOJ filed suit on October 15, seeking an injunction preventing California from sending ballots to or tabulating mail ballots from registered voters on DOJ's list. Compl. ¶ 63.[6] Four days later, DOJ filed an application for a temporary restraining order requesting relief by November 3. ECF 22-2 ("TRO Application"). Immediately after being assigned to the case, Judge Carter scheduled a hearing on DOJ's TRO Application for October 27. ECF 64. Hours later, DOJ filed a "request for expedited ruling," demanding the court rule by noon the following day. ECF 67 at 2.

After DOJ's self-imposed deadline passed, DOJ appealed, claiming "constructive denial" of its TRO Application. ECF 74 at 1. It then moved for an injunction pending appeal, and Los Angeles County moved to dismiss the appeal for lack of jurisdiction. This Court held that it lacked appellate jurisdiction, granted the motion to dismiss the appeal, and denied DOJ's motion. *See United States v. California*, No. 26-7070, 2026 WL 3212945, at *6 (9th Cir. Oct. 26, 2026) (per curiam). Judges Bennett and Sanchez wrote

---

[6] Services, Immigrant Rights and Education Network ("SIREN") and Mi Familia en Acción ("MFA") moved to intervene that same day. ECF 11. The district court granted intervention. ECF 148.

separately to explain why they would likely have denied DOJ's motion even if this Court had jurisdiction. *Id.* at *6-20.

On October 27, the district court held a hearing on DOJ's TRO Application. The following day, the court denied the TRO. The court held that DOJ likely lacked a cause of action; it was unlikely to succeed on its preemption claim; its requested relief would violate numerous federal laws; DOJ's factual assertions that the individuals identified on its list were likely noncitizens were unreliable and not credible; and the relief DOJ sought was barred by *Purcell*. *See generally* Order. DOJ filed the present appeal, ECF 152, and again moved for an injunction pending appeal.

## LEGAL STANDARD

"To determine whether to grant an injunction pending appeal, this court applies the test for preliminary injunctions." *Doe v. S.D. Unified Sch. Dist.*, 19 F.4th 1173, 1176 (9th Cir. 2021). The plaintiff "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

DOJ requests a mandatory injunction requiring California election officials to take affirmative action to segregate ballots, so its burden is higher

still—it must "establish that the law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

This Court reviews the district court's factual findings for clear error. *Brown v. Washington Interscholastic Activities Ass'n*, --- F.4th ----, No. 26-5488, 2026 WL 2891827, at *2 (9th Cir. Sep. 25, 2026).

## ARGUMENT

### I. DOJ's suit comes too late, and *Purcell* bars the relief it seeks.

The U.S. Supreme Court has "repeatedly cautioned that lower federal courts should not 'alter the election rules on the eve of an election.'" *Allen*, 608 U.S. at 514 (quoting *RNC v. DNC*, 589 U.S. 423, 424 (2020) (per curiam)); *see generally Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam). DOJ's attempt to upend California's election just *days* before Election Day is squarely prohibited by the *Purcell* principle, as Judge Bennett, Judge Sanchez, and the district court have each recognized. *California*, 2026 WL 3212945, at *15 (Bennett, J., concurring); *id.* at *16-20 (Sanchez, J., concurring); Order 25-26.

In fact, as the Supreme Court explained recently, *Purcell* "applies with even greater force" when "[t]he election is not merely upcoming; it has already started." *People Not Politicians*, 2026 WL 2883222, at *2. DOJ's motion here comes *after* California election officials have already been

receiving and processing mail ballots for weeks, which weighs even more heavily against DOJ. *See id.* (noting, in applying *Purcell* to stay injunction, that ballots had "been printed and mailed" and "[a]bsentee voting has already begun").

DOJ's request for emergency relief is particularly galling in view of its monthslong delay in bringing this litigation. *See Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring) (explaining *Purcell* cannot be overcome when party "delayed bringing the complaint to court"). The federal government has had California's purported voter file since at least March 2026, *see* ECF 107-3 ¶ 5—yet it chose to file this suit just three weeks before Election Day, an inexplicable and indefensible decision that by itself is reason enough to deny the present motion.

DOJ suggests *Purcell* is concerned only with voter confusion but cites no authority endorsing that distinction. Mot. 38. To the contrary, the Supreme Court has applied *Purcell* in litigation over rules that only impose duties on election officials, such as the deadline by which a mail ballot must be received to count. *E.g.*, *DNC v. Wis. State Legislature*, 592 U.S. 1039 (2020); *RNC*, 589 U.S. 423. Justice Kavanaugh reasoned in one such case that *Purcell* "not only prevents voter confusion but also prevents election administrator confusion—and thereby protects the State's interest in

running an orderly, efficient election." *Wis. State Legislature*, 592 U.S. at 1044 (Kavanaugh, J., concurring).

The relief DOJ seeks would create confusion among election administrators in spades. It would require California to sequester up to tens of thousands of mail ballots, without mechanisms or procedures to do so, and adopt an entirely new process for confirming citizenship. *See California*, 2026 WL 3212945, at *19 (Sanchez, J., concurring). Moreover, the district court found—based on evidence submitted by Los Angeles County—that the technological hurdles of complying with DOJ's demand would be hugely disruptive, risking a "catastrophic" impact on the ongoing election. Order 25; *see also* ECF 32-3 ¶ 3.[7] DOJ's requested relief *will* cause mass confusion for voters as well, as voters will be forced to scramble to figure out if they can vote by mail—or at all—and what they have to do to ensure their mail ballots count. Indeed, no voter can be sure that they have not been wrongly identified as ineligible. That is the exact type of "electoral chaos" *Purcell* guards against. *People Not Politicians*, 2026 WL 2883222, at *2.

---

[7] DOJ cites a declaration from the Shasta County Registrar saying *that* county could comply with the relief DOJ seeks, Mot. 16, but that sheds no light on whether Los Angeles County, with more than 50 times Shasta County's population, could feasibly implement the ballot segregation DOJ demands. The district court credited the evidence submitted by Los Angeles County that it could not comply without risking electoral disaster. Order 18.

While DOJ attempts to mischaracterize the relief it seeks here as a modest, "targeted remedy," the record tells a different story. Mot. 39 (quoting *Republican Party of Pa. v. Boockvar*, 592 U.S. 1068, 1070-71 (2020) (statement of Alito, J.)). This case is nothing like *Boockvar*, the principal authority DOJ relies on; the Court there did not address *Purcell* at all, and it discussed the segregation of "ballots received after election day." *Boockvar*, 592 U.S. at 1070 (statement of Alito, J.). Putting aside all ballots received after a certain date is a vastly simpler logistical task than segregating ballots from thousands of voters DOJ has identified, which would require individualized assessment of each ballot. *See* ECF 32-4 at 15; ECF 150 at 81. It would also require creating and implementing an entirely new, undefined procedure for "confirming" citizenship at the last minute in the midst of an election—a hugely complex undertaking and the very opposite of a targeted remedy. *See* ECF 32-4 at 15-16.

## II. DOJ has not shown a likelihood of success.

Even if *Purcell* were not an insurmountable obstacle to relief, DOJ's motion should still be denied because it has failed to show any likelihood of success on the merits. DOJ's motion mangles preemption doctrine and the Elections Clause beyond recognition, and the relief it seeks would violate federal law several times over.

### A. Federal law does not preempt California's procedures for determining voter eligibility.

DOJ's sole claim is that a federal criminal prohibition on noncitizen voting preempts a swath of California's election code concerning the manner in which election officials assess voter eligibility and adjudicate challenges to the same. That novel theory is meritless. As Judge Bennett concluded, "Nothing in § 611—a statute that criminalizes voting by a noncitizen—preempts California's comprehensive statutory scheme that has been duly enacted under the Elections Clause." *California*, 2026 WL 3212945, at *9 (Bennett, J., concurring).

Start with what California law has to say on the issue of noncitizens voting—which DOJ almost entirely ignores. California not only makes it a crime for noncitizens to vote, Cal. Elec. Code §§ 2101(a), 18560(a), but has established procedures to adjudicate challenges to voter eligibility, balanced against the serious risk of misidentifying citizens as ineligible. At the outset, California requires prospective voters to attest they are citizens under penalty of perjury at the time of registration. *Id.* § 2111. Next, California provides for the cancellation of registration upon "proof" that a registered voter is a noncitizen. *Id.* § 2201(a)(8). And as a backstop, California permits precinct boards to resolve challenges to voters' eligibility at the polls or when mail ballots are being processed. *Id.* §§ 14240, 14247, 15105. California law

also prescribes the standard for sustaining a challenge to a mail ballot: "[b]ecause the voter is not present, the challenger shall have the burden of establishing *extraordinary proof* of the validity of the challenge at the time the challenge is made." *Id.* § 15106 (emphasis added).

DOJ does not invoke the challenge procedure California law provides for here. Rather, it seeks to supplant California law with DOJ's preferred regime, under which it can send election officials lists of voters whom it suspects "might be" noncitizens, Compl. ¶ 59, and then require all ballots cast by those voters to be segregated and not counted until the voters' citizenship is "verified" through some unspecified means, *id.* ¶ 63. As DOJ explained to the district court, it seeks to impose a process under which, once election officials receive DOJ's list, the "burden now shifts" to election officials to verify the voters' citizenship—and if they do not, their ballots must be rejected. ECF 150 at 60-61.

The burden-shifting regime DOJ envisions is contrary to California law, and nothing in federal law preempts California's detailed framework for assessing the citizenship of voters and adjudicating challenges. The only statute DOJ invokes, 18 U.S.C. § 611, prohibits noncitizens from voting in federal elections, but it is completely silent on the *manner* in which a State is to assess a voter's citizenship or adjudicate a challenge to a voter's

citizenship. In fact, the *only* thing federal law says on the subject is that States must require attestation of citizenship at the time of registration. *See* 52 U.S.C. § 20508(b)(2). California does just that.

Section 611's singular focus on criminalizing noncitizen voting—and its silence on election procedures—rings the death knell for DOJ's preemption claim. The Elections Clause "invests the States with responsibility for the mechanics of congressional elections." *ITCA*, 570 U.S. at 9 (quoting *Foster*, 522 U.S. at 69). That extends to the "supervision of voting, protection of voters, prevention of fraud and corrupt practices, [and] counting of votes." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). And though Congress has the power to preempt California election laws, that power extends only "so far as it is exercised, and no farther." *ITCA*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)). In other words, the *text* of the relevant statute determines its preemptive scope. *Id.* at 14 ("[T]he reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent."). Here, the text of § 611 regulates only the actions of private individuals; it says *nothing* about election officials or state law. Accordingly, it does not preempt California's procedures for enforcing citizenship requirements.

Not only does § 611 not authorize DOJ to unilaterally impose an

additional citizenship-verification process, but the National Voter Registration Act ("NVRA") forecloses any attempt to demand supplemental proof from voters. *See ITCA*, 570 U.S. at 15 (holding NVRA preempts Arizona from requiring documentary proof of citizenship on the federal registration form); *Mi Familia Vota v. Fontes*, 129 F.4th 691, 710-11 (9th Cir. 2025) (holding NVRA preempts Arizona from requiring documentary proof of citizenship to vote by mail), *cert. granted sub nom. RNC v. Mi Familia Vota*, 146 S. Ct. 2799 (2026).[8] If DOJ disagrees with the laws Congress has enacted and believes that requiring additional verification of citizenship would be wise, the appropriate audience is Congress, not this Court. *See Watson v. RNC*, 609 U.S. 672, 695 (2026) ("[P]olicy arguments are properly directed to legislatures, not courts.").

Moreover, "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020). That is so because "[t]he Supremacy Clause gives

[8] The Supreme Court stayed an aspect of *Mi Familia Vota* not at issue here. *See RNC v. Mi Familia Vota*, 145 S. Ct. 108 (2024). It later granted certiorari on that unrelated aspect of the decision, and on whether the 90-day provision applies to systematic removals targeting suspected noncitizens. *See RNC*, 146 S. Ct. 2799 (2026). The Court did not grant certiorari on the other aspects of the decision discussed in this brief, including the Ninth Circuit's holding that States may not require documentary proof of citizenship to vote by mail.

priority to 'the Laws of the United States'" rather than the "enforcement priorities or preferences of federal officers." *Id.* (quoting U.S. Const. art. VI, cl. 2). In any event, DOJ cannot identify a single thing California has done to impede the enforcement of § 611 through the congressionally specified mechanism: criminal indictments of noncitizens who violate the prohibition. Order 10 (noting DOJ's recent indictments under § 611 in California).

Nor can DOJ convert California's purported failure to "cooperate" in its investigation, Mot. 27, into a legal right to direct procedures for issuing mail ballots and tabulating votes. Whether California cooperated with DOJ is irrelevant—it is California's right *not* to cooperate with the federal government. *See United States v. California*, 921 F.3d 865, 888 (9th Cir. 2019) (finding no preemption when California enacted laws to prevent cooperation with federal immigration enforcement, explaining "refusing to help is not the same as impeding" (citation omitted)). Any contrary result would run "directly afoul of the Tenth Amendment and the anticommandeering rule." *Id.*

DOJ attempts to justify its power grab by pointing (at Mot. 27) to *Norwood v. Harrison*, 413 U.S. 455 (1973), but that case is inapposite and does not help DOJ. *Norwood* held that a Mississippi program to support racially segregated private schools violated the Fourteenth Amendment's

equal-protection guarantee, just as it would if a State or locality ran a segregated school directly. *See* 413 U.S. at 467. In other words, Mississippi's provision of assistance to the private schools itself constituted state action in violation of the Fourteenth Amendment. But *Norwood* did not involve preemption—it does not even use that word—and it certainly does not provide DOJ with a roving license to demand that a State take any action DOJ might dream up in order to prevent future violations of federal law by other private individuals. *See generally id.*

Much more relevant than *Norwood* is the "general rule prohibiting issuance of an injunction against the commission of a crime." *United States v. Jalas*, 409 F.2d 358, 360 (7th Cir. 1969); *see, e.g.*, *United States v. Mattson*, 600 F.2d 1295, 1297-1300 & n.1 (9th Cir. 1979) (holding DOJ lacked cause of action to enjoin state officials to address unsanitary and unsafe facilities housing institutionalized citizens, despite invoking criminal prohibitions on constitutional rights violations). DOJ's demand flies in the face of that rule and ignores that Congress specified how § 611 is enforced: through criminal prosecutions of individuals who violate its prohibition. 18 U.S.C. § 611(b). "[T]he 'express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'" *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 328 (2015) (quoting

*Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)). Indeed, it is striking that DOJ has failed to identify a *single* court that has interpreted a federal criminal prohibition to invest the federal government with power over the state administration of elections. DOJ has thus failed to establish any authority or cause of action to bring this suit.

Further, the principle of constitutional avoidance and the major questions doctrine counsel in favor of denying the injunction. Earlier this month, a federal court declared § 611 an unconstitutional intrusion into States' exclusive authority over voter qualifications. *United States v. Cox*, No. 0:25-cr-60249, 2026 WL 2948729, at *11-12 (S.D. Fla. Oct. 1, 2026). If the Court construed § 611 to both set voter qualifications and authorize DOJ to interfere with ballot counting, it would raise serious constitutional concerns. *See United States v. Metcalf*, 156 F.4th 871, 882 (9th Cir. 2025) ("[C]ourts should construe ambiguous statutes to avoid the need even to address serious questions about their constitutionality.").

Finally, "[w]hen an agency claims to discover in a long-extant statute an unheralded power," courts "typically greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). Here, DOJ asserts an extraordinary power—the ability to dragoon election officials into revising their election processes during an election,

based only on the federal government's say-so. But there is *nothing* in § 611 that suggests Congress meant to grant DOJ such sweeping power to superintend state election administration. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress … does not, one might say, hide elephants in mouseholes.").

### B. The NVRA, the Voting Rights Act, and the Civil Rights Act bar DOJ's requested relief.

DOJ's requested relief is also barred by federal law several times over. *See INS v. Pangilinan*, 486 U.S. 875, 883 (1988) (explaining "[c]ourts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law"). *First*, the NVRA bars States from imposing additional post-registration citizenship-verification requirements on registered voters seeking to vote by mail—yet that is precisely what DOJ proposes to do here for the voters on its list. *See Mi Familia Vota*, 129 F.4th at 710.

*Second*, DOJ seeks to effectively nullify the registrations of voters on its list en masse on the eve of an election, which the NVRA's 90-day provision prohibits. *See* 52 U.S.C. § 20507(c)(2)(A); *see also Mi Familia Vota*, 129 F.4th at 715-16. It is no answer that DOJ seeks only to segregate and not count ballots, rather than remove voters from the rolls, *see* Mot. 36, because voter registration is not an end—it exists so that people can cast a ballot that

will be counted. *See Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995); *accord ITCA*, 570 U.S. at 13 (observing the NVRA would "cease[] to perform any meaningful function" if its provisions were circumventable).

*Third*, DOJ's demand to impose a citizenship-verification requirement on the voters on its list, but not others, is foreclosed by the NVRA's command that voter list maintenance be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1). And as the district court found, DOJ's list was generated through a process that would disproportionately misidentify naturalized citizens as noncitizens, Order 20, which also violates the NVRA, *Mi Familia Vota*, 129 F.4th at 714 (holding NVRA bars citizenship verification when "it is likely that the properly registered citizens who would be required to respond and provide documentation would be naturalized citizens" (citation omitted)).

Other federal laws similarly bar relief here. DOJ's request to enjoin state election officials from "tabulating … ballot[s]" from voters who have never been shown to be ineligible, Mot. 42, runs headlong into the Voting Rights Act's command that "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote … or willfully fail or refuse to tabulate, count, and report such person's vote," 52 U.S.C.

§ 10307(a). And DOJ's request to apply its injunction only to the voters on its list—and not other voters in the State—is foreclosed by the Civil Rights Act, which provides that "[n]o person acting under color of law shall" in "determining whether any individual is qualified under State law … apply any standard, practice, or procedure different from [those] applied under such law or laws to other individuals within the same" jurisdiction. 52 U.S.C. § 10101(a)(2)(A); *see also Mi Familia Vota*, 129 F.4th at 723.

## III. DOJ will not suffer irreparable harm absent an injunction.

DOJ's motion also fails to show that it is "*likely*" to suffer irreparable harm. *Winter*, 555 U.S. at 22. DOJ's brief spends a mere two sentences discussing irreparable harm, and all it says is that an injunction is necessary to prevent "noncitizens voting in a federal election." Mot. 40 (citation omitted). As the district court correctly found, DOJ's allegation that noncitizens are voting in California's election is not credible, for a host of reasons. *See* Order 22.

To start, DOJ's allegation of noncitizen voting depends on the veracity of the list of 20,000 purported noncitizens. But DOJ admits that DHS did not acquire the voter data it used to conduct its analysis directly from California, but rather through a third party whom DOJ refuses to name, on a date that DOJ insists on hiding behind a redaction. ECF 107-3, Ex. A. That

means DOJ has not established any chain of custody for the data on which DHS based its analysis. In fact, DOJ admits it does not even know if the data it received is *actually* California's voter list. ECF 107-3 ¶¶ 5-6 (stating the data "appears" to be California's voter list).

Next, DOJ indicates the list DHS received did not include voters' Social Security numbers and did not necessarily include dates of birth, precluding any successful matching with federal databases. ECF 150 at 52; ECF 107-2 ¶ 15. Accordingly, DHS "enhanced" the data by feeding it into a software program run by LexisNexis. *Id.* But as the district court found, DOJ has submitted *no* evidence that the LexisNexis program is reliable for "enhancing" a State's voter list. *See* Order 22. The only evidence in the record on the program indicates that it is in fact highly unreliable. *See* ECF 131-1 ¶¶ 7-12.

DOJ also admits that the federal databases to which it compared California's purported voter rolls are "incomplete, outdated, or mismatched." ECF 62-2 ¶ 16. The declarations DOJ provided purporting to support the veracity of DOJ's list come from law enforcement *users* of those databases, not from anyone with technical expertise in the creation, maintenance, or testing of the databases who could attest to their reliability. Perhaps for that reason, the declarants *never* say that the databases are

accurate, up-to-date, and comprehensive. And even if they were, the district court credited unrebutted expert testimony demonstrating that the matching process DHS used to generate the list via these databases was deeply flawed and prone to error. *See* Order 21.

Nor has DOJ provided any evidence that any of the purported noncitizens on its list have actually cast ballots. The analysis conducted by Los Angeles County suggests most have not—nearly half of the voters analyzed do not have active voter registrations, and the vast majority have never cast a ballot in any election. *See* Order 5. These findings follow a familiar pattern. As the district court found, when the federal government has made similar allegations about noncitizens on voter rolls in other States, the individuals on the government's lists "repeatedly turned out to be naturalized citizens." Order 24. DOJ's "disproven allegations with respect to noncitizen voting in other [S]tates raise further questions of credibility" as to its allegations here. *Id.* at 22.

DOJ has offered no basis upon which this Court could conclude that the district court's factual findings were clearly erroneous—to the contrary, DOJ's brief largely ignores them.[9] DOJ's theory of irreparable harm

[9] DOJ claims that the district court's factual findings should not be credited because the court did not "allow" the government to present witnesses, Mot. 15, 33. In fact, while DOJ said that it had witnesses available, *e.g.*, ECF 150

crumbles in light of its failure to credibly allege noncitizens are actually voting in California's election.

## IV. The balance of equities and the public interest foreclose an injunction.

Conversely, if DOJ succeeds, voters are certain to have their ballots segregated and not counted, which will cause them irreparable harm. The significant error rates that have been observed every other time the federal government has attempted to identify lists of noncitizens, *see supra* Background § I, are particularly likely to recur here because 21% of California's voting-age population are naturalized citizens—the highest rate in the country.[10] That risk is compounded by the lack of any existing process to "verify" voters' citizenship, Mot. 42, which DOJ apparently demands California set up in a matter of days while administering an ongoing election in which millions of ballots will be cast. DOJ's requested relief risks disenfranchising lawful voters, and that deprivation would be "real and completely irreparable" because "once the election occurs, there can be no

---

at 11, it never attempted to call them to the stand, and the district court never prevented DOJ from doing so. In any event, the district court had declarations from all parties' witnesses before it and made credibility determinations and factual findings based on that evidence. *See Shah v. United States*, 878 F.2d 1156, 1160 (9th Cir. 1989) (explaining district courts can make credibility determinations based on paper record).

[10] Katherine Schaeffer, *One in Ten Eligible Voters in the U.S. Are Naturalized Citizens*, Pew Rsch. Ctr. (Sep. 19, 2019), https://perma.cc/2G59-7XB7.

do-over and no redress." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (deprivation of constitutional rights "constitutes irreparable injury").

In addition, the "public interest in orderly election administration" would be severely jeopardized by the unprecedented, late-breaking relief DOJ seeks. *Estill v. Cool*, 295 F. App'x 25, 27 (6th Cir. 2008) (per curiam). As the district court found, there is no viable process to segregate thousands of ballots this close to Election Day. Order 25. Attempting a makeshift ballot sequestration in the eleventh hour while millions of votes are being processed would risk "catastroph[e]." *Id.*

**CONCLUSION**

This Court should deny DOJ's motion.

October 30, 2026

Respectfully submitted,

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta
Branden D. Lewiston
Robert Golan-Vilella
Julianna D. Astarita
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Ste. 400
Washington, DC 20001
Tel.: (202) 948-1135
Fax: (202) 968-4498
unkwonta@elias.law
blewiston@elias.law
rgolanvilella@elias.law
jastarita@elias.law

Tyler L. Bishop
**ELIAS LAW GROUP LLP**
1700 Seventh Ave., Ste. 2100
Seattle, WA 98101
Tel.: (206) 656-0177
tbishop@elias.law

*Counsel for Intervenors-Appellees SIREN and MFA*

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rules 27-1(1)(d) and 32-3 because it contains 5,521 words.

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta