No. 26-7231

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

*v.*

STATE OF CALIFORNIA; SHIRLEY N. WEBER, IN HER OFFICIAL CAPACITY AS CALIFORNIA SECRETARY OF STATE; DEAN C. LOGAN, IN HIS OFFICIAL CAPACITY AS THE COUNTY OF LOS ANGELES REGISTRAR-RECORDER/COUNTY CLERK,

*Defendants-Appellees*,

SERVICES, IMMIGRANT RIGHTS AND EDUCATION NETWORK; MI FAMILIA EN ACCIÓN; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; CALIFORNIA-HAWAII STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,

*Intervenors-Appellees*.

On Appeal from the United States District Court for the Central District of California, No. 2:26-cv-12025-DOC-ADS (Carter, J.)

## OPPOSITION OF DEAN C. LOGAN TO EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL

DAWYN R. HARRISON
County Counsel
PETER BOLLINGER
Assistant County Counsel
EVA CHU
Senior Deputy County Counsel
ADAM BAUMGARTEN
Senior Deputy County Counsel
648 Kenneth Hahn Hall Of Administration
500 West Temple Street
Los Angeles, California 90012
(213) 974-0809
pbollinger@counsel.lacounty.gov
echu@counsel.lacounty.gov
abaumgarten@counsel.lacounty.gov

CHRISTOPHER PELHAM
ABIGAIL URQUHART
ALEX SCANDROLI
NORTON ROSE FULBRIGHT
555 South Flower Street,
Forty-First Floor
Los Angeles, California 90071
(213) 892-9200
christopher.pelham@nortonrosefulbright.com
abigail.urquhart@nortonrosefulbright.com
alex.scandroli@nortonrosefullbright.com

SETH P. WAXMAN
DANIEL S. VOLCHOK
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com

M. PATRICK MOORE JR.
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
(202) 663-6000
pat.moore@wilmerhale.com

MICHAEL J. MONGAN
JOHN HE
WILMER CUTLER PICKERING
HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, California 94111
(628) 235-1000
michael.mongan@wilmerhale.com
john.he@wilmerhale.com

TOBY R. MERRILL*
JOSHUA KARSH**
SHARANYA MOHAN
CHRISTINE E. BASS
KYRA SIKORA
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, California 94609
(510) 738-6788
toby.merrill@publicrightsproject.org
joshua.karsh@publicrightsproject.org
sai.mohan@publicrightsproject.org
christine.bass@publicrightsproject.org
kyra.sikora@publicrightsproject.org

NICHOLAS R. WERLE
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
nick.werle@wilmerhale.com

* Licensed in Massachusetts and New York. Not licensed to practice law in California.

** Licensed in Illinois and Washington, D.C. Not licensed to practice law in California.

October 30, 2026

## INTRODUCTION

Four days ago, Judges Bennett and Sanchez explained in their concurring opinions the many fatal flaws with appellant's claim in this lawsuit and with its first "emergency" request for an injunction (filed months after appellant knew about the supposed problem). On remand, the district court did likewise—including repeatedly calling into question the credibility of appellant's evidence. Appellant now offers little new, and nothing persuasive. Its second "emergency" motion should be denied.

Indeed, the timing of the motion alone—including appellant's extreme dilatoriness in bringing this case—requires denial under *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), and its progeny. More than three weeks after Los Angeles County Registrar-Recorder ("County") began processing returned VBM ballots, and *four days* before election day (with mail and in-person voting underway), appellant would have this Court order the County to not only depart from state law and its long-established procedures for handling VBM ballots, but also take on an enormous burden atop its already monumental task of administering the midterm election. Specifically, appellant would have the County segregate thousands of ballots because appellant says at least some voters who cast them *may* not be U.S. citizens. Such a sea change in the middle of an election is assuredly forbidden by *Purcell*: When "[t]he election … has already started," the

"*Purcell* principle applies with even greater force." *People Not Politicians v. Onder*, 2026 WL 2883222, *2 (U.S. Sept. 25, 2026) (per curiam). That is all the more true given the district court's finding that any emergency is "solely due to [appellant's] own neglect," *i.e.*, its inexplicable delay in bringing suit. D.Ct. Dkt.149 ("Op.") at 21; *see also Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984).

This Court, moreover, *cannot* grant any injunction, because it lacks jurisdiction. Appellant's preliminary-injunction motion remains pending below and is set for an expedited hearing on the very issue appellant says went unexamined: the reliability of its list of supposed non-citizens on California's voter rolls. Any ruling on that motion will be appealable.

If more were somehow needed, appellant cannot make the required clear showing of entitlement to the mandatory injunction it seeks because it lacks standing, it lacks a cause of action, and its (obstacle) preemption theory is manifestly infirm. As to the last of those, the statute appellant relies on, 18 U.S.C. §611, makes it a misdemeanor for non-U.S. citizens to vote in federal elections—conduct California law also prohibits—but it says nothing about how States process ballots. And the County's processing poses no obstacle to prosecuting anyone under §611, because records of who voted, all that is needed to prosecute §611, are preserved. Recognizing this, appellant told this Court in its last appeal

that §611 gives appellant an interest in ensuring that no ballots cast by non-U.S. citizens are counted. It further argued that this interest allows the federal government to micromanage state and local elections by displacing any state election procedure that does not, in appellant's view, eliminate every possibility that an ineligible voter participates. Nothing in §611's text or structure supports that far-reaching claim. And the Constitution's Elections Clause forecloses it, giving the States authority over election administration unless Congress, not the federal executive, says otherwise. Congress did not obliquely say otherwise with §611.

Finally, the equities here weigh decisively against relief. The County has no process to segregate ballots; building one mid-election would put its extant election-administration systems at risk. And as appellant concedes (Compl. ¶60), segregated ballots would in practice never be counted, almost certainly disenfranchising up to thousands of eligible citizens. By contrast, appellant's interest in prosecuting unlawful voting is, as explained, untouched by denying an injunction.

Put simply, appellant's demand offends the Constitution's separation of powers thrice over: It asserts power the federal executive does not have, to obtain relief the federal judiciary has been instructed not to give, which would displace

authority that the Constitution gives to Congress (and the States). The motion should be denied.

## STATEMENT

### A. Factual Background

1. California, like the United States, limits the franchise to citizens and requires registrants to certify citizenship under penalty of perjury. Cal. Const. art. II, §2(a); Cal. Elec. Code §2111; *cf.* 52 U.S.C. §20508(b)(2). Each California county must send a vote-by-mail ("VBM") ballot to every active registered voter at least 29 days before the election. Cal. Elec. Code §3000.5(a). The County began doing so on October 1 and had mailed about 5.9 million by October 13. Op.3.

Voters return VBM ballots in envelopes bearing a declaration under penalty of perjury and the voter's signature. Cal. Elec. Code §3011(a)(1)-(2). The County compares that signature with the voter's registration record; if they match, the ballot is opened and the ballot removed, *id.* §§3019(a)(1), (b), 3019(h), 15101(b)(2), after which the ballot cannot be traced to the voter, D.Ct. Dkt.32-4 ¶18. That is consistent with California's guarantee of ballot secrecy, Cal. Const. art. II, §7, a guarantee at the core of American elections for more than a century, *Burson v. Freeman*, 504 U.S. 191, 200-206 (1992) (plurality).

To ensure they have sufficient time to handle VBM ballots, counties may begin processing when ballots are mailed. Cal. Elec. Code §15101(a). The County

publicly announced on October 1 that it would do so, began processing on October 5, and has livestreamed its processing online ever since, *see Official Video Streams*, L.A. County Registrar-Recorder/County Clerk, https://tinyurl.com/5n7j3nbp (visited Oct. 30, 2026).

California law provides multiple mechanisms to remove ineligible voters from the rolls and to challenge an individual's vote. For example, a voter's registration must be canceled upon "proof that the person is … ineligible to vote," Cal. Elec. Code §2201(a)(8), and a third-party (like appellant) may petition a state court for such cancellation, *id.* §2213. Likewise, voters may be challenged on the basis that they are non-citizens or otherwise ineligible. *Id.* §§14240(a), 15105. Where challenges occur in person, the voter (and challenger) may be questioned. *Id.* §14247. For VBM ballots, however, voters are not present to assert their rights, so "extraordinary proof" is required. *Id.* §15106. Because California, like every other State, preserves ballot secrecy, such challenges must be lodged before the VBM ballot envelope is opened. *Id.* §§3019(b), 3019(h), 15105. Appellant chose to use none of these established processes.[1]

2. In July, DHS Secretary Mullin wrote to California Secretary of State Weber, asserting that a "preliminary review," (Compl. ¶3), had revealed that "there

---

[1] California also provides a post-election remedy. Cal. Elec. Code §§16100(d), 16400-16940.

may be as many as 190,832 non-citizens registered to vote in California," Op.3. Secretary Weber asked how DHS had compiled its data and what methodology it had used. *Id.* DHS instead requested a virtual meeting with Secretary Weber. Dkt.31-2 at 6. When Secretary Weber requested that DHS respond in writing, DHS again pressed for a meeting, writing only that "the analysis was done using California's publicly available voter file" and "not done using SAVE." *Id.* at 5. (Citing Judge Bumatay's dissent, appellant asserts (Mot.21) that Secretary Weber "declined to address the issue in a meeting." That is misleading at best.)

On October 13—after three months of silence—the U.S. Justice Department ("DOJ") gave Registrar-Recorder/County Clerk Dean Logan a thumb drive listing roughly 20,000 people "the Federal Government believes are likely noncitizens who were sent a vote-by-mail ballot," and told the County to, within 48 hours, "segregate—not cancel—those individuals' vote-by-mail ballots until their citizenship status can be determined." D.Ct. Dkt.1-4 at 1; Op.3-4. Soon thereafter, DOJ warned that election workers who "knowingly tabulate" listed voters' ballots "risk becoming aiders and abettors to a federal crime." D.Ct. Dkt.32-2, Ex.E at 1-2.

The County responded within DOJ's 48-hour deadline. In response, the County noted that DOJ had disclosed nothing about how the list was compiled or anyone's citizenship could be verified, that DOJ's timeline was not feasible, and

that the request would violate state and federal law. *Id.* Indeed, appellant's demand to set aside ballots returned by voters on its list is flatly foreclosed by state law. *See* Cal. Elec. Code §15106. The County subsequently reviewed a sample of 200 records with county addresses, finding that 112 were canceled or inactive registrations to which no ballot had been mailed and 71.2% showed no voting history at all. D.Ct. Dkt.32-4 ¶48. (The United States admitted on a "re-review[]" that at least four of the 200 voters sampled "might have a claim to U.S. citizenship"—including because their parents were citizens—and a fifth was dead. D.Ct. Dkt.107-1 ¶13.)

As the district court found, segregation at this late date and on the scale demanded would make it "highly unlikely" that the County could certify the results by its December 3 deadline, "jeopardizing the" state's "ability to meet" the congressionally mandated election-certification deadline. Op.18; *see* Dkt.32-4 ¶36. That is because there are significant practical hurdles to such segregation. D.Ct. Dkt.32-4 ¶¶36-37; D.Ct. Dkt.32-3 ¶¶4, 11-22. Moreover, no held ballots could be counted, so any voters whose citizenship could not be "determined" to appellant's satisfaction in time would irreparably lose their "fundamental right" to vote in the midterm elections. Op.8, 25.

### B. Procedural History

The County's prior briefing recounts the procedural history prior to the first appeal; this brief focuses on events since that appeal.

On remand, appellant supplemented earlier filings, including stating that its list of 20,000 names was generated partly using "Lexis Nexis"—but it still did not explain how it "performed its analysis," what its "enrichment process" entailed, or its "specific matching rules" and "confidence thresholds." Op.21-22. Appellant also acknowledged that its data may be incomplete or wrong and conceded discrepancies in some 189 records. D.Ct. Dkt.62-2 ¶¶16-18, 23 & n.1; D.Ct. Dkt.150 at 54:15-18.

The district court denied a TRO. It found that appellant likely lacks standing because (1) the County's adherence to state law concerning VBM-ballot processing does not impair any §611 prosecution, (2) appellant cannot spend its way into standing, and (3) its vote-dilution theory is "too tenuous." Op.12. The court also concluded that appellant likely lacks a cause of action, Op.12-13, and that §611 likely does not preempt California's procedures, Op.13-17. It then found no irreparable harm because appellant's "theoretical risk of imminent harm is solely due to its own neglect," *i.e.*, its "unexplained delay of multiple months refutes its eleventh-hour claim." Op.21. The court also found appellant's list "not credible." Op.21. It found that segregation would impose severe burdens and

jeopardize timely certification, Op.18, 22-24, and that "a ballot segregated, in effect, would be a ballot removed" from the count, Op.24. Finally, the court held that *Purcell* weighed against relief. Op.25-26. As the court summarized, if the request "were granted, either party could create chaos for their own political purposes to disrupt the election process," and "[o]ver 20,000 registered Californians would potentially lose the right" to vote. Op.2. Seeking to prevent such disruption, the court admonished that DOJ's repeated threats to prosecute election workers "must stop." Op.7.

## ARGUMENT

An injunction pending appeal is governed by the same factors as a preliminary injunction. *Feldman v. Arizona Secretary of State's Office*, 843 F.3d 366, 367 (9th Cir. 2016) (en banc). Because appellant seeks a mandatory injunction, which is "particularly disfavored," it must show that "the law and facts *clearly favor*" its position, "not simply that [it] is likely to succeed." *Garcia v. Google*, *Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). And because it asks this Court for relief the district court denied, appellant must contend with that court's findings, which are reviewed for clear error. *Southwest Voter Registration Education Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam). Appellant cannot carry that burden. And its motion does not assert (and

thus appellant has waived any argument) that any of the court's findings are clearly erroneous.

## I. THIS COURT LACKS JURISDICTION

A TRO denial ordinarily is not appealable, *Wilson v. U.S. District Court*, 161 F.3d 1185, 1187 (9th Cir. 1998), unless it threatens "serious, perhaps irreparable, consequence[s]" and "can be 'effectually challenged' only by immediate appeal," *Carson v. American Brands, Inc.*, 450 U.S. 79, 84 (1981). Appellant bears the burden of establishing jurisdiction, *In re Ozenne*, 841 F.3d 810, 814 (9th Cir. 2016) (en banc), and it cannot make that showing. Appellant's preliminary-injunction motion remains pending and is set for an expedited hearing at which the parties may present witnesses "regarding the reliability of the October List and the methodology Plaintiff used to produce it." D.Ct. Dkt.159, at 1. Any ruling on that motion will be "fully reviewable on appeal and expedited proceedings may be requested." *Wilson*, 161 F.3d at 1187. And as the district court found, ballot processing does not impair appellant's only cognizable interest, *i.e.*, prosecuting violations of §611. Op.10-11. The retained envelopes and electronic records continue to show who voted. *Infra* Part III.A.

## II. *PURCELL* FORECLOSES THE REQUESTED INJUNCTION

The Supreme Court has repeatedly directed that "federal courts should ordinarily not alter the election rules on the eve of an election." *Republican*

*National Committee v. Democratic National Committee*, 589 U.S. 423, 424 (2020) (per curiam) ("*RNC*"). "That is because running a statewide election is a complicated endeavor," involving "thousands of state and local officials and volunteers [who] must participate in a massive coordinated effort to implement [state law] on the ground before and during the election, and again in counting the votes." *Democratic National Committee v. Wisconsin State Legislature*, 592 U.S. 1039, 1043 (2020) (Kavanaugh, J., concurring) ("*DNC*"). As noted, moreover, this principle is strongest when, as here, an election is underway. *Onder*, 2026 WL 2883222, at *2. The County mailed ballots in early October, began processing returned ballots on October 5, and had processed more than 331,000 by October 20. Its 123 vote centers opened October 24, and 523 more open tomorrow. Op.23; D.Ct. Dkt.32-4 ¶¶23-25. The district court rightly declined to change the rules at this late stage. Appellant cites no case doing so, much less in the nation's largest election jurisdiction, D.Ct. Dkt.32-4 ¶5.

Appellant responds (Mot.38-39) that it seeks to apply, not change, existing rules. That is incorrect. While the ban on non-citizen voting is settled, "this dispute is about the procedures used to enforce that prohibition." *United States v. California*, 2026 WL 3212945, at *9 (Bennett, J., concurring) ("CA Order"). And an injunction would mandate ballot processing that "no provision of California election law … contemplates." *Id.* at *19 (Sanchez, J., concurring). It would also

require new ballot-processing infrastructure, software and hardware changes, training, and diverting staff. *Id.* at *13 (Bennett, J., concurring). Finally, it would inevitably exclude some ballots from being counted at all: As appellant concedes, it cannot determine the listed voters' citizenship before the election concludes. Op.18. That procedures for verifying and counting ballots fall squarely within *Purcell* is shown by *Purcell* itself, *see* 549 U.S. at 4-5 (voter-identification procedures), and by *Andino v. Middleton*, 592 U.S. 906, 907 (2020) (Kavanaugh, J., concurring in grant of application for stay) (absentee-envelope witness requirement), and *RNC*, 589 U.S. at 424 (absentee-ballot deadline). None of the orders in those cases changed who was qualified to vote; each altered what officials would do with a ballot. The order sought here would do likewise—on a greater scale.

*Republican Party of Pennsylvania v. Boockvar*, 592 U.S. 1068 (2020), *cited in* Mot.32-33, 39, does not help appellant. The ballots at issue there were self-segregating because of their late arrival, existing state law and guidance *already required* their segregation, and no one had to identify voters from an outside list. None of those features is present here. Nor do the provisions appellant invokes (Mot.39)—the recount regulation, Cal. Code Regs. tit. 2, §20363, and the provisional-ballot provision of the Help America Vote Act ("HAVA"), 52 U.S.C.

§21082—authorize setting aside returned ballot envelopes based on a third party's list. *See* CA Order, 2026 WL 3212945, at *14 (Bennett, J., concurring).

Nor is *Purcell* limited to confusion about "how, when, and where" to vote. Mot.38. *Purcell* "prevents election administrator confusion—and thereby protects the State's interest in running an orderly, efficient election." *DNC*, 592 U.S. at 1044 (Kavanaugh, J., concurring). The requested last-minute injunction would severely undermine that interest. It would also (contrary to appellant's blithe suggestion) confuse voters. Voters would not know whether they are on appellant's undisclosed list, whether their mailed ballots would be segregated, or what steps they could take to ensure their ballot would ultimately be counted (including whether to vote in person instead). "Voters may be dissuaded from voting because they could be wrongly labeled as voting illegally." CA Order, 2026 WL 3212945, at *20 (Sanchez, J., concurring).

Finally, appellant invokes Justice Kavanaugh's statement in a concurring opinion that "I would think that the *Purcell* principle … *might* be overcome even with respect to an injunction issued close to an election if a plaintiff establishes" four circumstances. *Merrill v. Milligan*, 142 S.Ct. 879, 881 (2022) (Kavanaugh, J., concurring) (emphasis added). The Supreme Court has not adopted this statement, nor has the Ninth Circuit, and appellant cannot prevail by pretending that the statement is the law. In any event, appellant cannot establish any (let alone all) of

the four circumstances, which are that "(i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Id.* The merits here *are* clearcut—but in defendants' favor. *Infra* Part III. As the district court found: appellant will not suffer irreparable harm without the injunction, *infra* Part IV.A; appellant has delayed in suing, Op.21; *accord* CA Order, 2026 WL 3212945, at *5; and the changes are not remotely feasible without confusion and hardship, *infra* Part IV.B.

In short, if *Purcell* forecloses any claim or injunction, it forecloses these.

## III. Appellant Will Not Likely Succeed And Is Not Clearly Entitled To Relief

### A. Appellant Lacks Standing And A Cause Of Action

1. Appellant must make a "clear showing" that it will likely establish standing, *Murthy v. Missouri*, 603 U.S. 43, 58 (2024), including "a concrete and particularized injury caused by the defendant and redressable by the court," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The injury appellant initially identified was its ability to enforce 18 U.S.C. §611. D.Ct. Dkt.1 ¶¶9-10. Appellant has abandoned that theory, and for good reason: Appellant is already enforcing §611, D.Ct. Dkt.31-4 at 48-49, and the records of mail-ballot envelopes

election officials must retain for 22 months, *see* 52 U.S.C. §20701, provide the relevant evidence for a prosecution.

Appellant's remaining standing theories fail. Any supposed burden on federal resources is unavailing because a plaintiff "cannot spend its way into standing." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024). And the County's decision to follow state law and not assist in federal "verification" efforts inflicts no cognizable injury; appellant remains free to enforce §611 on its own, but the "Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program," *Printz v. United States*, 521 U.S. 898, 935 (1997).

Appellant also asserted an interest in preventing the dilution of lawful votes. That is a "generalized grievance about the conduct of government," not a particularized injury. *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam). The "mere fact that some invalid ballots have been inadvertently counted, without more, does not … show a distinct harm to any group of voters," much less to the federal executive. *Election Integrity Project California, Inc. v. Weber*, 113 F.4th 1072, 1089 n.13 (9th Cir. 2024). Moreover, that theory rests on a "highly attenuated chain of possibilities," *Clapper v. Amnesty International USA*, 568 U.S. 398, 410 (2013): that people on an unadjudicated list are non-citizens, registered in

the County, obtained ballots despite attesting to citizenship under oath, and will cast ballots that are counted. The County's sample shows how unlikely that chain is. D.Ct. Dkt.32-4 ¶48.

The cases in appellant's prior briefing and Judge Bumatay's dissent do not support appellant. *Anderson v. United States*, 417 U.S. 211 (1974), simply affirmed criminal convictions for fraudulent voting; it says nothing about standing. *Bost v. Illinois State Board of Elections*, 607 U.S. 71 (2026), involved candidates with a concrete stake in the rules governing their races, *see id.* at 76. Appellant is not a candidate. *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000), concerned injury from a defendant's *own* violation of federal law; no one alleges that the County itself violates §611, and to the extent appellant argues that processing ballots under state law makes the County an accomplice to §611 violations, that fails for the reasons discussed in Part III.B. Finally, *Ex parte Siebold*, 100 U.S. 371 (1880), upheld convictions of state election officials under a statute regulating their conduct; no such statute applies here.

2. Appellant lacks a cause of action. The Supremacy Clause does not supply one, *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324-327 (2015), nor does §611. Appellant invokes a general equitable tradition, but equitable relief must be of the kind "traditionally accorded by courts of equity" at

the Founding. *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025). The sweeping relief sought here—requiring local officials to identify and set aside registered voters' ballots in contravention of state law and established procedure—is anything but. The cases appellants cite protecting federal property and interstate commerce (Mot.25-29) involved nothing of the like. And while Congress has infrequently granted the executive civil injunctive authority in the context of a criminal statute, *e.g.*, 18 U.S.C. §177(a), it has not done so here. Congress likewise knows how to authorize the executive to seek civil relief in election matters; it did so in the Voting Rights Act, 52 U.S.C. §10308(d), the National Voter Registration Act, *id.* §20510(a), and HAVA, *id.* §21111—but not in §611. The "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Armstrong*, 575 U.S. at 328.

### B. Section 611 Does Not Preempt California Law

Appellant's sole claim is that 18 U.S.C. §611 preempts California's ballot processing decisions, on a theory of obstacle preemption. That is wrong.

To start, California law aligns with federal law in limiting the franchise to U.S. citizens. *See* Cal. Elec. Code §18560(a). Where state law "trace[s]" federal law, the former poses no obstacle to the latter. *Chamber of Commerce v. Whiting*, 563 U.S. 582, 601-602 (2011) (plurality).

More fundamentally, California's processing of VBM ballots does nothing to impede any §611 prosecution. The relevant fact a prosecutor must prove in a §611 case is that the defendant cast a ballot. The evidence that shows that conduct is the envelope—even once separated from the ballot. And as explained, under federal law the County will retain records of mail-ballot envelopes for at least 22 months after the election. D.Ct. Dkt.150 at 75:14-21. So, the conduct appellant seeks to enjoin poses no obstacle to the enforcement of the only statute appellant invokes for its preemption claim.

Apparently recognizing this, appellant shifted in its reply in the last appeal to arguing (p.7) that "counting votes from noncitizens impedes the congressional ban on noncitizen voting." But even putting aside that this argument indulges the exceedingly dubious assumption (rejected by the district court) that appellant's list is reliable, *see* Op.21-22, §611's creation of a criminal offense creates no federal interest regarding vote counting. Which ballots are counted is a matter the Constitution reserves to the States and, for federal elections, to Congress. U.S. Const. art. I, §4; *id.* amend. X. Disturbing that constitutional allocation of authority would require a clear congressional statement, because "[i]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460-461 (1991). Section 611

contains no statement at all, let alone a clear one. And that omission is particularly notable because *other* federal statutes do specify when States must "separate[] and h[o]ld apart" ballots, *see* 52 U.S.C. §21082. That shows that Congress knows how to require (or authorize) segregation. A federal misdemeanor statute simply does not authorize federal executive officials to alter a State's counting procedures by decree.

Were it otherwise, federal officials could claim the authority to meddle in or take over every state and local election in the country, because federal law also criminalizes other acts related to voting, such as voting fraudulently (52 U.S.C. §20511(2)(B)) or twice (52 U.S.C. §10307(e)). Under appellant's theory, an administration could suddenly claim, during an ongoing election and without reliable evidence, that fraud is rampant. On that basis, the federal executive could order (or obtain a court order for) selected jurisdictions to halt the processing of all returned ballots pending the imposition of a verification process found nowhere in state law—thereby disrupting the election and potentially denying large numbers of eligible voters their fundamental right to vote. Appellant has cited no case giving such a sweeping reading to federal criminal law, a reading starkly

inconsistent with recent Supreme Court warnings about the overreach of federal criminal law, *e.g.*, *Fischer v. United States*, 603 U.S. 480, 497 (2024).[2]

Appellant's real complaint is that California is impeding not federal *law*, but the current administration's *policy preference* regarding whether ballots should be set aside on the strength of an unverified federal list. But "policy arguments are properly directed to legislatures, not courts," *Watson v. Republican National Committee*, 609 U.S. 672, 695 (2026), *quoted in* CA Order, 2026 WL 3212945 at *11 (Bennett, J., concurring). Put another way, "the possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption." *Kansas v. Garcia*, 589 U.S. 191, 212 (2020). Indeed, even "abstract and unenacted *legislative* desires" cannot be placed "above state law" by invoking preemption. *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 778 (2019) (plurality) (emphasis added).

Appellant's reliance (Mot.25-29) on *Norwood v. Harrison*, 413 U.S. 455 (1973), and similar cases is misplaced. Those cases concern a State's own support for violations of federal law. California law requires no one to vote unlawfully. To the contrary, California law forbids exactly what §611 forbids.

---

[2] Appellant wrongly argued in the last appeal that §611 was enacted under the Elections Clause. "[T]he Elections Clause empowers Congress to regulate how federal elections are held, but not who may vote in them." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 16 (2013).

Nor does aiding-and-abetting liability change the analysis. Section 611 contains no accomplice provision, and 18 U.S.C. §2 requires an "affirmative act," taken "with the intent of facilitating the offense's commission," *Rosemond v. United States*, 572 U.S. 65, 71 (2014). Even were there any wrongdoing occurring here, awareness of the possibility of such wrongdoing, coupled with a failure to prevent it, is not enough. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 490-491 (2023). Relabeling the County's adherence to state-law mail-ballot return processes "as 'induc[ing], encourag[ing] or promot[ing]' aliens to violate § 611 cannot rewrite the statute." CA Order, 2026 WL 3212945 at *10 (Bennett, J., concurring).

Finally, the "commingl[ing]" of ballots appellant decries (Mot.11, 38) is the consequence of the secret ballot, which California's constitution guarantees, Cal. Const. art. II, §7, and which as noted has been the American rule for well over a century. Indeed, the same "commingling" is true of in-person voting: No cast ballot can later be pulled from the count and attributed to a particular voter. If that means a ballot cast by a non-citizen cannot later be removed, Congress has accepted that consequence by leaving the secret ballot in place. This Court should not preempt established state law based on an asserted federal interest that Congress has not seen fit to change across more than 100 years.

## IV. The Remaining Factors Weigh Against An Injunction

### A. Appellant Has Not Shown Irreparable Harm

Appellant's asserted harms are non-existent for the reasons discussed: Ballot processing cannot impede any §611 prosecution, and appellant's interest in preventing unlawful voting is fully served by California's existing procedures.

Appellant's asserted harm is also speculative, as the district court found, Op.12—a finding appellant does not challenge as clearly erroneous. Indeed, appellant's own declarants describe a list of only "likely" non-citizens, and concede the data may be "incomplete, outdated, or mismatched." D.Ct. Dkt.62-2 ¶¶16, 23 & n.1. As noted, on reviewing 200 of the records, appellant found that approximately two percent may be citizens, likely by virtue of their parents' citizenship status. D.Ct. Dkt.107-1 ¶13. At that rate, approximately 140 of the estimated 7,000 LA County residents on the list could be citizens. *See* D.Ct. Dkt.32-3 ¶25. And that requires assuming the data is reliable despite the district court's adverse credibility determination and its finding that appellant's "protocol" for matching voter data with (unknown) sources of citizenship information "raises significant concerns" because appellant never "disclose[d] 'the specific matching rules'" or "criteria," necessary "'information about the third-party platform'" used, or "how it 'linked names to Social Security numbers.'" Op.21-22. All this,

combined with appellant's "disproven allegations with respect to noncitizen voting in other states," destroy the "credibility" of its data here. *Id.* at 22.

In any event, if appellant has individualized proof about any registrant, including those it says it has charged (Mot.11, 28), state law provides it with options to contest that ballot. *Supra* p.5. Appellant chose not to do so. And it cites no authority for its assertion (Mot.34) that California's evidentiary standard does not bind it even though the Constitution, as discussed, assigns authority over elections to the States, subject to revision only by Congress—not the executive.

**B. The Equities And Public Interest Weigh Against An Injunction**

The balance-of-equities factor merges with the public-interest factor, *Nken v. Holder*, 556 U.S. 418, 435 (2009), and both weigh against an injunction here. Although appellant invokes election integrity, integrity is measured by whether every lawfully cast vote is counted—*i.e.*, whether eligible and registered Americans are not wrongfully denied their right to vote—and whether election officials can do their critical work without fear or threat. The requested injunction fails on both counts: It would hold eligible citizens' ballots indefinitely, irreparably violating voters' right "to cast their ballots and have them counted," *United States v. Classic*, 313 U.S. 299, 315 (1941). After all, "[i]f the United States, with its capabilities," cannot make that determination before the election concludes, "there is no reason to believe that California or the County could."

Op.24. The injunction would also force the nation's largest election jurisdiction to rebuild its systems mid-election. And it would tell officials who are counting votes, under threat of federal prosecution, that the threat works.

The injunction's consequences, moreover, would not end with this election. An order setting aside ballots based on dubious federal lists would establish that any federal agency, armed with a list, may halt the count in any county in the nation. No court has endorsed that proposition, and Congress has foreclosed it. The public interest decisively weighs against making Los Angeles County the first test case.

The injunction would also impose serious burdens on the County. Modifying the voter database to flag particular voters in the manner and for the purpose appellant demands "is impossible … without shutting down" the County's electronic tracking system. D.Ct. Dkt.32-3 ¶¶13-14. The County would also have to reconfigure its ballot-sorting machines and electronic pollbooks (which are required for in-person voting throughout the County), something that "cannot be completed safely and uniformly before Election Day." *Id.* ¶¶8-10, 15, 17. "[T]here is no reason in the record to discount this evidence." CA Order, 2026 WL 3212945, at *14 (Bennett, J., concurring). Appellant breezily calls this burden "de minimis," Mot.42, but its only evidence is a declaration it filed in the district court that came from the registrar of Shasta County. To begin with, that registrar—

whom the Shasta County Board of Supervisors censured on August 11—had "no election experience prior to his [2025] appointment" and "has repeatedly aligned himself with groups and individuals that deny the validity of elections." D.Ct. Dkt.131 ¶6. Moreover, Los Angeles's 5.9 million registered voters constitute an electorate 51 times the size of Shasta's 115,403 registered voters. *See Report of Registration as of September 4, 2026*, Cal. Sec. State (visited Oct. 30, 2026), https://elections.cdn.sos.ca.gov/ror/60day-gen-2026/county.pdf. Most importantly, the declaration does not address Los Angeles County's systems, and the declaration's proposed alternative, issuing a new ballot and voiding the voter's original, D.Ct. Dkt.107-4 ¶5, would cancel registered voters' ballots in violation of state law, Cal. Elec. Code §15106, based solely on an unverified list. All that aside, the district court credited the County's evidence of the burdens, Op.22-24, a finding appellant nowhere challenges as clearly erroneous.

Finally, an injunction must reasonably describe what officials must do. Fed. R. Civ. P. 65(d)(1). Courts must consider "what is necessary, what is fair, and what is workable." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (per curiam). Appellant has offered "no workable plan of any kind." CA Order, 2026 WL 3212945, at *15 (Bennett, J., concurring). Barring election officials from mixing listed voters' ballots with others, without guidance on how to identify them

or what becomes of them, would invite precisely the "chaos" the district court foresaw. Op.22.

## CONCLUSION

The motion for an injunction should be denied.

October 30, 2026

Respectfully submitted,

*/s/ Seth P. Waxman*

DAWYN R. HARRISON
County Counsel
PETER BOLLINGER
Assistant County Counsel
EVA CHU
Senior Deputy County Counsel
ADAM BAUMGARTEN
Senior Deputy County Counsel
648 Kenneth Hahn Hall Of Administration
500 West Temple Street
Los Angeles, California 90012
(213) 974-0809
pbollinger@counsel.lacounty.gov
echu@counsel.lacounty.gov
abaumgarten@counsel.lacounty.gov

SETH P. WAXMAN
DANIEL S. VOLCHOK
WILMER CUTLER PICKERING
HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000
seth.waxman@wilmerhale.com
daniel.volchok@wilmerhale.com

M. PATRICK MOORE JR.*

CHRISTOPHER PELHAM
ABIGAIL URQUHART
ALEX SCANDROLI
NORTON ROSE FULBRIGHT
555 South Flower Street,
Forty-First Floor
Los Angeles, California 90071
(213) 892-9200
christopher.pelham@nortonrose
fulbright.com
abigail.urquhart@nortonrose
fulbright.com
alex.scandroli@nortonrose
fulbright.com

TOBY R. MERRILL*
JOSHUA KARSH**
SHARANYA MOHAN
CHRISTINE E. BASS
KYRA SIKORA
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, California 94609
(510) 738-6788
toby.merrill@publicrightsproject.org
joshua.karsh@publicrightsproject.org
sai.mohan@publicrightsproject.org
christine.bass@publicrightsproject.org

WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
(617) 526-6000
pat.moore@wilmerhale.com

MICHAEL J. MONGAN
JOHN HE
WILMER CUTLER PICKERING
HALE AND DORR LLP
50 California Street, Suite 3600
San Francisco, California 94111
(628) 235-1000
michael.mongan@wilmerhale.com
john.he@wilmerhale.com

kyra.sikora@publicrightsproject.org

NICHOLAS R. WERLE
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
nick.werle@wilmerhale.com

* Licensed in Massachusetts and New York. Not licensed to practice law in California.

** Licensed in Illinois and Washington, D.C. Not licensed to practice law in California.

## CERTIFICATE OF COMPLIANCE

This opposition complies with the applicable provisions of both the Federal Rules of Appellate Procedure and this Court's rules in that: (1) according to the word-count feature of the word-processing system used to generate the opposition (Microsoft Word), the opposition contains 5,597 words, excluding the portions exempted from the count by the rules, and (2) the opposition has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

*/s/ Seth P. Waxman*
SETH P. WAXMAN

## CERTIFICATE OF SERVICE

On this 30th day of October, I electronically filed the foregoing using the Court's CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Seth P. Waxman*
SETH P. WAXMAN