No. 26-7231

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

UNITED STATES OF AMERICA,

*Plaintiff - Appellant*,

v.

SERVICES, IMMIGRANT RIGHTS AND EDUCATION NETWORK; MI FAMILIA EN ACCION; LEAGUE OF UNITED LATIN AMERICAN CITIZENS; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE; CALIFORNIA-HAWAII STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,

*Intervenors - Appellees*,

STATE OF CALIFORNIA; SHIRLEY WEBER, PH.D., in her official capacity as the California Secretary of State; DEAN LOGAN, in his official capacity as the County of Los Angeles Registrar-Recorder/County Clerk,

*Defendants - Appellees*.

---

On Appeal from the United States District Court
for the Central District of California
The Honorable David O. Carter, District Judge
Case No. 2:26-CV-12025-DOC-ADS

---

**BRIEF OF AMICI CURIAE**
**FORMER ATTORNEYS FOR THE DEPARTMENT OF JUSTICE**
**IN SUPPORT OF DEFENDANTS-APPELLEES**

---

Wendy R. Weiser
Sean Morales-Doyle
Andrew B. Garber
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310

Christine Berger
Maura Eileen O'Connor
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
777 6th Street NW, Suite 1100
Washington, DC 20001
(202) 249-7190

Brian A. Sutherland
COMPLEX APPELLATE
LITIGATION GROUP LLP
96 Jessie Street
San Francisco, CA 94105
(415) 649-6700
brian.sutherland@calg.com

*Attorneys for Amici Curiae*
*Former Attorneys for the Department of Justice*

# TABLE OF CONTENTS


**Page**

INTERESTS OF AMICI CURIAE .......... 1

SUMMARY OF ARGUMENT .......... 2

ARGUMENT .......... 3

This lawsuit marks a major departure from DOJ's longstanding norms and policies against election interference. .......... 3

A. DOJ has no authority to assert these novel claims against the State and County, let alone the clear authority DOJ typically requires for such an enforcement action. .......... 3

B. By bringing this lawsuit in violation of DOJ's policies against election interference, DOJ risks impeding the administration of an election that is days away .......... 6

1. DOJ's actions violate its policy against taking overt steps on election investigations close to election day .......... 8

2. DOJ's demands violate its policy of respecting state election administration and disrupt ongoing election processes. .......... 10

C. This lawsuit deviates from DOJ's normal investigatory procedures, and DOJ risks disenfranchising citizens. .......... 14

CONCLUSION .......... 19

ADDENDUM: List of Amici Curiae Former Attorneys of the Department of Justice

# TABLE OF AUTHORITIES

**Page(s)**

## *Cases*

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021) ........................................ 6

*Carachuri-Rosendo v. Holder*,
560 U.S. 563 (2010) ........................................ 6

*Hubbard v. United States*,
514 U.S. 695 (1995) ........................................ 6

*Husted v. A. Philip Randolph Institute*,
584 U.S. 756 (2018) ........................................ 7

*Louisiana Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) ........................................ 6

*United States v. Hemmingson*,
157 F.3d 347 (5th Cir. 1998) ........................................ 7

*Younger v. Harris*,
401 U.S. 37 (1971) ........................................ 12

## *Constitutional Provisions*

U.S. Const. art. I, § 4, cl. 1 ........................................ 7

## *Statutes*

18 U.S.C. § 611 ........................................ 3, 11, 18

52 U.S.C. § 20501 ........................................ 14

52 U.S.C. § 20510 ........................................ 4

52 U.S.C. § 21111 ........................................ 4

Cal. Elec. Code § 3001 ........................................ 9

## TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

### *Other Authorities*

Andrew Blankstein et al., *DOJ Demands That California Counties Help Identify Noncitizen Voters*, NBC News (Oct. 24, 2026) .......... 10

*Federal Prosecution of Election Offenses* (Richard C. Pilger et al. eds., 8th ed. 2017) .......... 8

Sam Levine, *DOJ's Suspected Non-Citizens List Includes 'High Percentage' of Those Born in US, LA Officials Say*, The Guardian (Oct. 20, 2026) .......... 17

Memorandum from the Att'y Gen., *Additional Requirements for the Opening of Certain Sensitive Investigations* (Feb. 5, 2020) .......... 13

Memorandum from the Att'y Gen., *Election Year Sensitivities* (June 24, 2024) .......... 13

U.S. Dep't of Justice, Justice Manual .......... 5, 8, 9, 11, 18

## INTERESTS OF AMICI CURIAE[1]

Amici are former attorneys for the Department of Justice ("DOJ" or "the Department"). Amici are identified by name, position(s), and dates of service at DOJ in the Addendum to this brief.

Amici have prosecuted criminal cases in district courts across the country, conducted civil and criminal investigations, defended the United States in civil actions, and represented it in appeals. Amici include DOJ senior leaders who have been appointed and served in Republican and Democratic administrations and career attorneys and leaders who have served in the Department across six decades. All amici are deeply interested in upholding the constitutional and prudential values reflected in DOJ policy.

With this brief, amici aim to assist the Court by explaining how DOJ policy prioritizes avoiding interference, or even the appearance of interference, in elections and why DOJ's abrupt departure from that policy counsels against granting its emergency motion.

---

[1] No party or party's counsel authored this brief in whole or in part, and no person, other than amici curiae and their counsel, contributed money intended to fund the preparing or submitting of this brief.

## SUMMARY OF ARGUMENT

Attorneys of the Department of Justice have long recognized that public confidence in our democracy depends on the integrity of our elections. To maintain public trust in elections, DOJ traditionally followed policies to ensure its attorneys avoid even the appearance of interference in electoral processes, which are administered by the States. This lawsuit is one of many recent executive actions that cast aside traditional DOJ restraint and replace it with demands to overhaul state election procedure while an election is ongoing. Until recently, these DOJ policies had endured across many presidential administrations. But DOJ abandoned its policies in this case.

DOJ's abrupt turn away from longstanding policies is relevant to its motion here. This case and DOJ's requests are highly irregular. Its legal contentions are novel and weak, its factual claims unreliable, and its desired remedy would be disruptive of state election administration while an election is ongoing. DOJ's irregular approach and sudden departure from its longstanding norms and procedures in an elections case weigh heavily against granting DOJ's motion.

## ARGUMENT

### This lawsuit marks a major departure from DOJ's longstanding norms and policies against election interference.

This lawsuit, as a matter of both timing and scope, violates DOJ policies that exist to prevent election interference and the appearance thereof. DOJ brought this action while an election was in progress and less than three weeks before election day. Its action does not target individual conduct, but instead seeks to reconfigure election administration itself. These departures weigh heavily against providing relief because they disrupt an ongoing election and risk disenfranchising voters.

#### A. DOJ has no authority to assert these novel claims against the State and County, let alone the clear authority DOJ typically requires for such an enforcement action.

DOJ does not point to any clear congressional authorization for this lawsuit as none exists. The statute on which it relies, 18 U.S.C. § 611, permits DOJ to prosecute individual noncitizens who vote in a federal election, not to regulate how States or local governments administer elections. Instead, it asserts a novel authority to compel the States to "segregate and stop counting ballots." Order Denying Temporary Restraining Order, at 15, *United States v. California*,

No. 2:26-cv-12025 (C.D. Cal. Oct. 28, 2026), Dkt. No. 149 ("Order Denying TRO"). Congress has bestowed some limited election enforcement authority on the Attorney General, demonstrating it can speak clearly on the matter when it wishes. 52 U.S.C. §§ 20510(a), 21111. No grant of authority applies here.

DOJ's legal theory that a statute allowing prosecution of individuals also silently confers the power to coerce sovereign States would extend the bounds of DOJ authority well beyond its current contours. If the federal government could transform a narrow criminal prohibition targeting individual conduct into a discretionary power to bring civil enforcement actions to amend state policy, then it would have virtually limitless power to direct state policy and resources. DOJ's assertion of such a theory in this case attempts to assert federal control where neither the Constitution nor Congress have assigned it. States would endure significant additional burdens if DOJ could, at any time, second-guess or override the States' policy choices and procedures.

In the experience of amici, Department attorneys typically ensure that they have clear authority to act before acting in a case whose filing might affect voting in, and the States' constitutional power to administer, an ongoing election. DOJ attorneys have understood that

when the federal government uses its enforcement authority, whether in a criminal prosecution or in a civil enforcement action, the consequences may be profound for the defendant, victims, and their families, whether or not a conviction or liability ultimately results.[2] A criminal defendant may suffer arrest and imprisonment, even if not convicted. A civil defendant may lose money and reputation, even if not found liable. And litigation against a State puts inter-governmental cooperation and the State's sovereignty to govern its residents at risk. DOJ policy provides that its attorneys should "avoid inter-governmental litigation whenever possible." U.S. Dep't of Justice, Justice Manual, 1-10.100 (Apr. 2018).[3] When DOJ attorneys act in excess of their authority, they can inflict these harms without a lawful purpose.

DOJ's traditionally cautious approach to exercising authority in cases like this, especially when litigating against another sovereign, is not just good policy: federal powers are limited. An agency "literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it."

---

[2] *See, e.g.*, U.S. Dep't of Justice, Justice Manual, 9-27.001 (June 2023), https://www.justice.gov/jm/jm-9-27000-principles-federal-prosecution (principles of federal prosecution).

[3] www.justice.gov/jm/jm-1-10000-litigation-against-state-governments-relations-client-agencies.

*Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam) (quotation marks omitted). There is no DOJ action that can have greater political significance than interference with an ongoing election.

### B. By bringing this lawsuit in violation of DOJ's policies against election interference, DOJ risks impeding the administration of an election that is days away.

To help DOJ attorneys uphold the Department's longstanding values, such as impartiality and integrity, and maintain a safe distance from constitutional and statutory boundaries, DOJ utilizes policies to guide attorney conduct. The most important statement of DOJ policy is the Justice Manual (formerly the United States Attorneys' Manual), which sets forth internal policies and procedures. The Supreme Court has cited and relied on DOJ's statements of internal policy in many cases. *See, e.g.*, *Carachuri-Rosendo v. Holder*, 560 U.S. 563, 579 (2010); *Hubbard v. United States*, 514 U.S. 695, 714 (1995) (opinion of Stevens, J.). DOJ manuals reflect "what the department considers typical."

*United States v. Hemmingson*, 157 F.3d 347, 362 (5th Cir. 1998). The Justice Manual, if followed, would foreclose this lawsuit.

DOJ's policy to exercise its authority with restraint, as discussed above, applies with its greatest force in the context of actions related to elections. The "Constitution gives States the authority to set the qualifications for voting in congressional elections," and "the authority to set the 'Times, Places and Manner' to conduct such elections in the absence of contrary congressional direction." *Husted v. A. Philip Randolph Institute*, 584 U.S. 756, 774 (2018). Thus, the States control both qualifications for voting and procedures for determining whether a voter is qualified, *i.e.*, voter registration. Congress may override state rules as they pertain to the "Times, Places and Manner" of elections. U.S. Const. art. I, § 4, cl. 1. States generally "can use whatever plan they think best" to maintain an accurate and current voter registration roll. *Husted*, 584 U.S. at 776-77. Here, DOJ has jettisoned that careful approach to litigation in the elections context and when commencing litigation against a separate sovereign.

DOJ's election-related policies exist to ensure DOJ does not interfere – or even create the appearance of interfering – with elections so that its actions do not impact the results of the elections or impede

the States' administration of them. Federal investigation "runs the risk of chilling legitimate voting and campaign activities and of interjecting the investigation itself into ongoing campaigns and the adjudication of any ensuing election contest." Justice Manual, 9-85.300 (Aug. 2022).[4] Thus, "it is the general policy of the Department not to conduct overt investigations … until after the outcome of the election allegedly affected by the fraud is certified." *Federal Prosecution of Election Offenses* 9 (Richard C. Pilger et al. eds., 8th ed. 2017).[5]

### 1. DOJ's actions violate its policy against taking overt steps on election investigations close to election day.

As election day approaches and voters pay closer attention to candidates and issues, the risk that DOJ action may influence the election significantly increases. For that reason, "the Department should not engage in overt criminal investigative measures in matters involving alleged ballot fraud until the election in question has been concluded, its results certified, and all recounts and election contests concluded." Justice Manual, 9-85.300 (Aug. 2022). Federal "agents may never select the timing of any action, including investigative steps, criminal charges, or statements, for the purpose of affecting any

---

[4] www.justice.gov/jm/jm-9-85000-protection-government-integrity.

[5] https://electionjudgments.org/api/files/15950091773541o6uhighakw.pdf.

election." Justice Manual, 9-85.500 (Aug. 2022). "Such a purpose is inconsistent with the Department's mission and with the Principles of Federal Prosecution." *Ibid.*

These timing rules exist to ensure DOJ respects the limits of its authority and steers clear of impeding state election administration. By filing this lawsuit less than three weeks before election day, DOJ is consuming valuable state and local resources and creating confusion for voters who may not be sure if the rules will change as they are casting or after they have cast their ballot.

DOJ's novel legal theory still would be meritless, but less harmful, if it had pressed its theory earlier, before California issued ballots to registered voters. DOJ waited until October 15, 2026, to bring this action, even though California published its timeline for mail ballot transmission years ago. Cal. Elec. Code § 3001. DOJ's allegation that California's actions "knowingly facilitate unlawful voting" (DOJ Compl. ¶ 59), coupled with a demand for impossible and illegal remedies, can only cause confusion, discourage voters, and distract election officials from urgent administrative responsibilities. Further, DOJ's demands were factually and legally impossible to satisfy, as the district court explained. *See* Order Denying TRO, at 17-24. DOJ itself alleged that "it

is not practicable or feasible" for the United States to investigate and verify that thousands of persons meet the citizenship qualification for voting. DOJ Compl. ¶ 60. Nevertheless, DOJ demanded that state and local officials do just that in only two days.[6]

By making impossible demands while an election is ongoing, DOJ has sowed confusion and apprehension about whether all votes will be counted and diverted away limited, critical resources that are needed to administer the election. Moreover, regardless of DOJ's intention, its actions here give the impression that it is meddling in an active election, thereby diminishing confidence in elections and violating its own policies.

**2. DOJ's demands violate its policy of respecting state election administration and disrupt ongoing election processes.**

Another rationale for DOJ's election policies is that they operationalize the constitutional principle that the executive branch,

[6] Reportedly, DOJ made identical demands to 57 of California's 58 counties on October 23, 2026. The letters warn officials of "legal consequences" for not meeting DOJ's demands, even suggesting local officials could be committing a federal crime if they do not follow DOJ instructions. *See* Andrew Blankstein et al., *DOJ Demands That California Counties Help Identify Noncitizen Voters*, NBC News (Oct. 24, 2026), www.nbcnews.com/politics/2026-election/doj-demands-california-counties-help-identify-noncitizen-voters-rcna605356.

especially DOJ, plays only a narrow role in elections. DOJ has long recognized that States are the proper administrators and enforcers of state election laws. Federal interference with this regime disrupts and unsettles election processes.

Under the Justice Manual, the "Department has long recognized that the States – not the federal government – are responsible for administering elections, determining the validity of votes, and tabulating the results, with challenges handled by the appropriate election administrators, officials, legislatures, and courts." Justice Manual, 9-85.300 (Aug. 2022). "The Department's role is limited to investigating and prosecuting violations of federal election laws and deterring criminal conduct." *Ibid.* To the extent that "an immediate need for overt measures exists," the Justice Manual counsels sharing information with state or local authorities (*ibid.*), not suing them.

In this case, instead of seeking to prosecute individual criminal conduct under 18 U.S.C. § 611, DOJ called for systemic change – a new procedure under which voters identified through database queries and output must have their qualifications reaffirmed for their votes to count. This was investigation-by-algorithm, coupled with an unrealistic demand for the State to create new procedures and conduct

individualized inquiries. As the district court found, DOJ's "request for election officials to identify and segregate ballots belonging to individuals on the October List would force Defendants to create wholly new procedures while the election is already underway." Order Denying TRO, at 23 (citing declarations). Even if creating wholly new procedures were possible, DOJ's role is not to reform state election procedures.

Additionally, as reflected in DOJ policy, comity requires "a proper respect for state functions" and for the federal government, "anxious though it may be to vindicate and protect federal rights and federal interests," to do so "in ways that will not unduly interfere with the legitimate activities of the States." *Younger v. Harris*, 401 U.S. 37, 44 (1971). DOJ did not uphold this principle when it made demands that would require the State and County to make changes to election systems and processes and redirect critical, limited resources while an election is underway.

Amici urge the Court not to grant an emergency motion that constitutes such a major departure from longstanding DOJ principles and risks impeding the administration of an ongoing election and disenfranchising citizens. DOJ attorneys have been required to follow the above-referenced policies and principles throughout many

presidential administrations. Attorney General William Barr directed that agency staff "must be sensitive to safeguarding the Department's reputation for fairness, neutrality, and nonpartisanship" because in certain cases, "the existence of a federal criminal or counter-intelligence investigation, if it becomes known to the public, may have unintended effects on our elections."[7] Attorney General Merrick Garland gave substantively identical orders: "As Department employees," he said, "we must be particularly sensitive to safeguarding the Department's reputation for fairness, neutrality, and non-partisanship" when it comes to "any matter or case" that risks "affecting any election."[8] DOJ failed to honor these principles in this case.

The purpose of policies that call for caution when DOJ risks encroaching on States' authorities over elections is to prevent situations exactly like this one. DOJ's theory would allow DOJ to bring civil enforcement actions against state officials any time DOJ alleged that state law failed to prevent violations of a federal criminal statute, thereby disrupting lawful state policies and practices. Constant

---

[7] Memorandum from the Att'y Gen., *Additional Requirements for the Opening of Certain Sensitive Investigations* 1 (Feb. 5, 2020), https://docs.house.gov/meetings/JU/JU00/20200624/110836/HHRG-116-JU00-20200624-SD009-U19.pdf.

[8] Memorandum from the Att'y Gen., *Election Year Sensitivities* 1 (June 24, 2024), www.justice.gov/archives/jmd/media/1359366/dl.

interruption, especially so close to an election, would prevent election officials from undertaking their duties efficiently, create uncertainty over election rules, and tilt the constitutional balance of power. DOJ's breach of its policies here should raise concerns that it is causing those outcomes.

### C. This lawsuit deviates from DOJ's normal investigatory procedures, and DOJ risks disenfranchising citizens.

The right to vote "is a fundamental right." 52 U.S.C. § 20501(a)(1). DOJ is typically cautious in bringing election enforcement actions against States close to an election in part because such actions run the risk of chilling the exercise of the right to vote. Not only did it fail to exercise caution in this case, the extraordinary remedy it seeks risks disenfranchising eligible voters.

Several facts in this case lead to the conclusion that by not following normal investigatory processes, DOJ risks disenfranchising thousands of voters.

- Only three weeks before election day, DOJ sent California and Los Angeles County letters demanding they verify citizenship status for thousands of voters within a 48-hour

window. That is an impossible demand. *See* Order Denying TRO, at 3-4. DOJ itself admitted "it would be unable to complete the citizenship verification prior to election day." *Id.* at 24. If state and local officials segregated and did not count ballots until citizenship could be rechecked and confirmed, the most likely outcome is that most such ballots would never be counted.

- DOJ provided the County with a list of around 20,000 names which DOJ had "high confidence" were noncitizens registered to vote. In July, however, it had sent California a letter alleging that there were as many as 190,832 noncitizens registered to vote in the State. DOJ has not explained why the list shrank or why the process leading to the smaller list is more reliable. *Id.* at 3-4.

- Part of the underlying data comes from third-party databases. DOJ would not previously have relied on third-party data without detailing where it came from and why it is reliable. Here, DOJ revealed that the platform used for name matching was Lexis Nexis the night before the TRO

hearing and did not explain the protocols for its database matching processes. *Id.* at 21-22.

- Similar DOJ matching analyses have proven unreliable. In Nevada, DHS initially identified 15,903 potential noncitizen registrants. It later provided 185 names to Nevada, whose own analysis found that all 185 were citizens. *Id.* at 22. Another district court found recently that a similarly compiled list had "high likelihood of error in review" because it was based on "faulty data sources that sweep in U.S. citizens." *Id.* at 6-7.

- A sample analysis of the data by Los Angeles County found that 42.9% of the voters were cancelled and 4.6% were inactive. *Id.* at 5. It also found that among those who had birthplace information listed, 38.9% indicated they were born in the United States. Declaration of Aman Bhullar, ¶ 24(d), Dkt. 32-3.

- The Acting Deputy Attorney General, when asked about these likely inaccuracies on the list, acknowledged there

"may be some names on there who, it turns out, ultimately are citizens. We're not perfect ...."[9]

As the district court found, DOJ failed to show it used a reliable process to create a list of 20,000 "likely" noncitizens. Order Denying TRO, at 22, 24. DOJ does not have to be perfect to initiate an investigation, but it should not rely on flawed and ill-defined information to sue a State while an election is ongoing. That is all the more true when it demands an extraordinary remedy: to segregate, and effectively block, the votes of thousands.

The risk of disenfranchisement is acute because, as the district court reasoned, there is no reason to conclude that California could complete those additional determinations in time. In this case, a "ballot segregated, in effect, would be a ballot removed." Order Denying TRO, at 24. In short, by generating its list of thousands of names and then asking California to determine and confirm citizenship (in addition to the registration process that California already has used), DOJ was

---

[9] Sam Levine, *DOJ's Suspected Non-Citizens List Includes 'High Percentage' of Those Born in US, LA Officials Say*, The Guardian (Oct. 20, 2026), https://www.theguardian.com/us-news/2026/oct/20/doj-non-citizens-la.

effectively seeking actions that would likely result in citizen votes that would not be counted.

DOJ's attempt to construct a database-driven mass challenge is a departure from ordinary procedure and policy. If DOJ wishes to enforce a criminal statute such as 18 U.S.C. § 611, then it must do so through normal criminal law procedures. Under normal procedures, DOJ would typically gather evidence and build its case through quiet investigative steps, especially in an elections case where public enforcement actions may turn an investigation into an issue in the election and upend administration of the election. Under the Justice Manual, prosecutors should initiate a prosecution when they believe "the admissible evidence will probably be sufficient to obtain and sustain a conviction" absent other considerations counseling against federal prosecution – a standard higher than merely having probable cause as to any individuals. Justice Manual, 9-27.220 (June 2023).[10]

In this case, DOJ seeks to reverse the usual procedure. Instead of quietly gathering evidence to avoid election interference, it has begun with a loud pronouncement of its conclusion. Instead of building a case that segregating up to 20,000 ballots is necessary, it asks the Court to

---

[10] www.justice.gov/jm/jm-9-27000-principles-federal-prosecution.

assume that its data constitute conclusive proof and order that remedy upfront. This stark departure from regular order risks jeopardizing voting rights. To obtain an exceptional remedy – blocking the ballots of thousands of voters whose registrations were accepted by the state entities responsible for supervising them – DOJ needs to establish that it has authority to bring its claim and reliable evidence to meet the burden of proof. Neither is present here.

## CONCLUSION

This Court should deny the emergency motion for injunction pending appeal.

October 30, 2026

Respectfully submitted,

By: s/ Brian A. Sutherland

Brian A. Sutherland
COMPLEX APPELLATE LITIGATION GROUP LLP
96 Jessie Street
San Francisco, CA 94105
(415) 649-6700

*Attorneys for Amici Curiae Former Attorneys for the Department of Justice*

Wendy R. Weiser
Sean Morales-Doyle
Andrew B. Garber
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(646) 292-8310

Christine Berger
Maura Eileen O'Connor
BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
777 6th Street NW, Suite 1100
Washington, DC 20001
(202) 249-7190

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-7231

I am the attorney or self-represented party.

**This brief contains** 3,493 **words,** including [ ] words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

● is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

- ☐ it is a joint brief submitted by separately represented parties.
- ☐ a party or parties are filing a single brief in response to multiple briefs.
- ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [ ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Brian A. Sutherland **Date** October 30, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

# Addendum

## ADDENDUM:

### Identity of Amici[1]

1. **Bruce L. Adelson**, Senior Trial Attorney, Voting Section, Civil Rights Division (2000-2005), Attorney-Advisor, Federal Coordination and Review Section, Civil Rights Division (2005-2006)
2. **Daniel R. Anderson**, Deputy Director, Fraud Section, Civil Division (2016-2019); Assistant Director, Fraud Section, Civil Division (2013-2016); Special Counsel for Health Care Fraud, Civil Division (1999-2013); Trial Attorney, Fraud Section, Civil Division (1996-1999)
3. **Donald Ayer**, Deputy Attorney General (1989-1990); Principal Deputy Solicitor General (1986-1988); U.S. Attorney for the Eastern District of California (1982-1986); Assistant U.S. Attorney, Northern District of California (1977-1979)
4. **Jonathan L. Backer**, Attorney, Appellate Section, Civil Rights Division (2021-2025)
5. **Samuel Bagenstos**, Principal Deputy Assistant Attorney General, Civil Rights Division (2010-2011), Deputy Assistant Attorney General, Civil Rights Division (2009), Trial Attorney, Appellate Section, Civil Rights Division (1994-1997)
6. **Lema Bashir**, Trial Attorney, Civil Rights Division (2007-2025)
7. **Barbara Bosserman**, Deputy Chief (Cold Case and Legal Research Units), Civil Rights Division, Criminal Section (2017-2025), Senior Legal Counsel (2008-2025), Trial Attorney 2006-2006 (including detail to E.D. Louisiana), Attorney Advisor (2000-2006)
8. **Julia A. Caroff**, Assistant U.S. Attorney (1989-2015), U.S. Attorney's Office for the Eastern District of Michigan.
9. **Kelsi Brown Corkran**, Attorney, Appellate Staff, Civil Division (2006-2012)

[1] Affiliations are listed for institutional identification only.

10. **Subodh Chandra**, Assistant U.S. Attorney, U.S. Attorney's Office for the Northern District of Ohio (1999-2002)
11. **Ty Cobb**, Special White House Counsel (2017-2018), Assistant U.S. Attorney (1980-1986), U.S. Attorney's Office for the District of Maryland, Chief of the Criminal Division and Mid-Atlantic Regional Coordinator, Organized Crime Drug Enforcement Task Force (1983-1986)
12. **Clare Connors**, United States Attorney (2022-2025), District of Hawaii; Assistant U.S. Attorney (2005-2011), U.S. Attorney's Office for the District of Hawaii; Trial Attorney (2003-2004), Tax Division
13. **Kelsi Corkran**, Attorney, Appellate Staff, Civil Division (2006-2012)
14. **Martin Cronin**, Deputy Chief, Criminal Division, U.S. Attorney's Office for the District of New Jersey (1996-1999), Assistant U.S. Attorney (1989-1996)
15. **Ryan Crosswell**, Trial Attorney, Public Integrity Section (2020-2025); Assistant U.S. Attorney, Southern District of California (2017-2020), Assistant U.S. Attorney, Middle District of Louisiana (2014-2017)
16. **John Farmer**, Assistant U.S. Attorney (1990-94)
17. **Diana K. Flynn**, Chief, Appellate Section, Civil Rights Division (1986-2018), Attorney, Civil Rights Division (1984-1986)
18. **Gregory Friel**, Deputy Assistant Attorney General, Civil Rights Division (2012-2022); Special Litigation Counsel, Appellate Section (2006-2011); Attorney, Appellate Section (1992-2006); Trial Attorney, Civil Rights Division (1989-1992)
19. **Harriett Galvin**, Assistant U.S. Attorney, Appellate Division, (1987-2015), U.S. Attorney's Office for the Southern District of Florida
20. **Peter R. Ginsberg**, Assistant U.S. Attorney (1984-992), U.S. Attorney's Office, Eastern District of New York
21. **Raymond Granger**, Assistant United States Attorney (1992-1998), U.S. Attorney's Office for the Eastern District of New York

22. **Roger Haines**, Assistant U.S. Attorney, U.S. Attorney's Office for the Southern District of California (1978-2007)
23. **Lynn Helland**, Supervisory Assistant U.S. Attorney (1989-2017), Assistant U.S. Attorney (1982-1989), U.S. Attorney's Office for the Eastern District of Michigan
24. **Robert Kengle**, Deputy Chief (1999-2005), Special Counsel (1996-99), Trial Attorney (1984-1996), Voting Section
25. **Bill Killian**, United States Attorney for the Eastern District of Tennessee (2010-2015)
26. **Loretta King**, Deputy Assistant Attorney General, Civil Rights Division (1994-2011); Deputy Chief, Voting Section, Civil Rights Division (1992-1994); Trial Attorney, Torts Branch, Civil Division (1990-1992); Trial Attorney, Employment Litigation Section, Civil Rights Division (1981-1990)
27. **Philip Allen Lacovara**, Assistant to the Solicitor General (1967-1969), Deputy Solicitor General (1972-1973), Counsel to the Watergate Special Prosecutor (1973-1974)
28. **Tim Lambert**, Trial Attorney, Voting Section (2001-2004)
29. **Jesse Laslovich**, United States Attorney, District of Montana (2022-2025)
30. **Brian Legghio**, Assistant United States Attorney (1982-1989) for the Eastern District of Michigan
31. **Andrew Levchuk**, Senior Trial Attorney, Public Integrity Section, Criminal Division (2007-2011); Senior Counsel, Computer Crime and Intellectual Property Section (2005-2007)
32. **Jim Lewis**, United States Attorney, Central District of Illinois (2010-2016)
33. **Ellyn Lindsay**, Assistant U.S. Attorney for the Central District of California (1987-2015), Honor Graduate, U.S. Department of Justice, Criminal Division (1985-1987)
34. **Jasmine Lott**, Trial Attorney, Civil Rights Division (2017-2025)
35. **Mary McCord**, Acting Assistant Attorney General for National Security (2016-2017); Principal Deputy Assistant Attorney General for National Security (2014-2016)

36. **John McKay**, United States Attorney for the Western District of Washington (2001-2007)
37. **Barbara L. McQuade**, U.S. Attorney (2010-2017), U.S. Attorney's Office for the Eastern District of Michigan
38. **Mildred E. Methvin**, Assistant U. S. Attorney (1979-1981), U. S. Attorney's Office for the Western District of Louisiana; U. S. Magistrate Judge (1983-2009), U. S. District Court for the Western District of Louisiana
39. **Robert J. Moossy, Jr.**, Deputy Assistant Attorney General for Civil Rights (2015-2025), Chief, Criminal Section of the Civil Rights Division (2009-2015)
40. **Steven Mulroy**, U.S. Department of Justice (1991-2000); Trial Attorney, Voting Section (1991-1995)
41. **A. Carley Palmer**, General Crimes Section Deputy Chief (2021-2023) and Assistant U.S. Attorney (2016-24), U.S. Attorney's Office for the Central District of California
42. **Janet L. Parker**, U.S. Attorney's Office for the Eastern District of Michigan (1985-2020)
43. **Carter G. Phillips**, Assistant to the Solicitor General (1981-1984), Office of the Solicitor General
44. **Mark Posner**, Special Counsel, Civil Rights Division (1988-1995); Trial Attorney, Civil Rights Division (1980-1987, 1996-2003)
45. **Gary Restaino**, U.S. Attorney for the District of Arizona (2021-2025); Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (2022)
46. **Joe Rich**, Chief, Attorney, Voting Section (1999-2005); Attorney, Civil Rights Division (1968-1999)
47. **Bob Rush**, Trial Attorney (1970-1973), Voting Section, Civil Rights Division; Special Assistant U.S. Attorney (1973), U.S. Attorney's Office for the District of Columbia
48. **Sarah Saldaña**, U.S. Attorney (2011-2014), U.S. Attorney's Office for the Northern District of Texas
49. **Jocelyn Samuels**, Acting Assistant Attorney General for Civil Rights and Principal Deputy Assistant Attorney General for Civil Rights (2011-2014), Civil Rights Division, U.S. Department of Justice

50. **Sheila Sawyer**, Assistant U.S. Attorney (1992-2001, 2014-2025), U.S. Attorneys' Offices for the Districts of Massachusetts and Maine
51. **Robert Steinberg**, Senior Assistant U.S. Attorney, S.D. Ohio (1968-1978)
52. **Anne Tompkins**, U.S. Attorney, Western District of North Carolina (2010-2015)
53. **Michael J. Tuteur**, Assistant U.S. Attorney (1991-1994), U.S. Attorney's Office for the District of Massachusetts
54. **S. Lane Tucker**, U.S. Attorney (2022-2025), U.S. Attorney's Office for the District of Alaska
55. **Stanley A. Twardy, Jr.**, United States Attorney for the District of Connecticut (1985-1991)
56. **Joyce Vance**, U.S. Attorney (2009-2017); Assistant U.S. Attorney (1991-2009), U.S. Attorney's Office for the Northern District of Alabama
57. **John Vandreuil**, U.S. Attorney (2010-2017), Assistant U.S. Attorney (1980-2010), Western District of Wisconsin
58. **John Warshawsky**, Senior Trial Counsel and Trial Attorney (1990-2008 and 2010-2014), Civil Division
59. **Seth Wayne, Trial Attorney**, Special Litigation Section, Civil Rights Division (2016-2017)
60. **Bill Yeomans**, Acting Assistant Attorney General (2000), Chief of Staff (1996-2000), Counsel to the Assistant Attorney General (1994-1996), Deputy Chief, Criminal Section (2002-2005), and Trial Attorney, Appellate Section (1981-1994), Civil Rights Division