No. 26A

# In the Supreme Court of the United States

UNITED STATES OF AMERICA, APPLICANT

*v.*

STATE OF CALIFORNIA, ET AL.

**APPLICATION FOR INJUNCTION PENDING APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT AND REQUEST FOR ADMINISTRATIVE INJUNCTION**

D. JOHN SAUER
*Solicitor General*
*Counsel of Record*
*Department of Justice*
*Washington, D.C. 20530-0001*
*SupremeCtBriefs@usdoj.gov*
*(202) 514-2217*

## TABLE OF CONTENTS


Statement .......... 3

Argument .......... 6

A. The United States is likely to succeed on appeal .......... 8

B. The other factors support injunctive relief .......... 16

Conclusion .......... 19

## PARTIES TO THE PROCEEDING

The United States of America is the applicant here and was plaintiff-appellant below. The State of California; Shirley Weber, California Secretary of State; and Dean Logan, County of Los Angeles Registrar-Recorder/County Clerk, are respondents here and were defendants-appellees below. Services, Immigrant Rights and Education Network; Mi Familia En Accion; League of United Latin American Citizens; National Association for the Advancement of Colored People; and California-Hawaii State Conference of the National Association for the Advancement of Colored People are also respondents here and were intervenors-appellees below.

## RELATED PROCEEDINGS

United States District Court (C.D. Cal.)

*United States* v. *California*, No. 26-cv-12025 (Oct. 28, 2026)

United States Court of Appeals (9th Cir.):

*United States* v. *California*, No. 26-7231 (Oct. 30, 2026)

*United States* v. *California*, No. 26-7070 (Oct. 26, 2026)

# In the Supreme Court of the United States

No. 26A

UNITED STATES OF AMERICA, APPLICANT

*v.*

STATE OF CALIFORNIA, ET AL.

**APPLICATION FOR AN INJUNCTION PENDING APPEAL
TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
AND REQUEST FOR ADMINISTRATIVE INJUNCTION**

Pursuant to Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Solicitor General—on behalf of the United States—respectfully requests that this Court issue an injunction pending appeal in this case. In addition, because the United States' irreparable injury is ongoing, the United States respectfully requests an administrative injunction pending the Court's consideration of this application.

Congress has made it "unlawful for any alien to vote" in any federal election. 18 U.S.C. 611. Enforcing that exclusion of aliens is "part of the sovereign's obligation 'to preserve the basic conception of a political community.'" *Foley* v. *Connelie*, 435 U.S. 291, 296 (1978). Yet despite that prohibition, aliens sometimes register to vote, and do vote, in our elections. That unfortunate reality is evidenced by New Jersey's recent admission that it has thousands of aliens on its voter rolls and that hundreds of those aliens have voted. See Matt Friedman, *"It's the honor system,"* Politico, July 30, 2026, https:perma.cc/VN6NE-TK7J. It is also evidenced by California's past ad-

mission that "a mistake caused as many as 1,500 noncitizens being registered to vote in the state." Mark Osborne, *1,500 noncitizens may have been registered to vote in California DMV error*, ABC News, Oct. 9, 2018, https://perma.cc/9RM4-THZX.

In this case, this Office has been informed that the United States has identified more than 20,000 individuals who appear to be registered to vote in California based on publicly available information at the time that information was received, but who, in the United States' view, are likely not U.S. citizens. The United States asked the district court and the Ninth Circuit for an injunction requiring California to segregate mail ballots cast by those persons until the lawfulness of the ballots could be adjudicated. The lower courts denied that relief, with Judge Bumatay dissenting from the Ninth Circuit's decision. This Court should grant the "modest remedy" requested by the United States—"stopping California from mixing the ballots of citizens and suspected noncitizens." App., *infra*, 22a (Bumatay, J., dissenting). "This solution would not cancel any vote but would allow time to verify the eligibility of suspected noncitizens." *Ibid.*

The United States is likely to succeed on the merits of its appeal. The district court concluded that the United States lacks Article III standing to bring this suit, but the United States suffers a judicially cognizable "injury to its sovereignty" from the "violation of its laws," *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U.S. 765, 771 (2000)—here, the law prohibiting aliens from voting in federal elections. The district court also concluded that the United States lacks a cause of action, but under *Ex parte Young*, 209 U.S. 123 (1908), a litigant (including the United States) generally may sue in equity to prevent state action that violates federal law. The court of appeals and district court determined that California has the power to adopt its own procedures for verifying voter qualifications, but a State's

procedures cannot control the operation of a federal statute such as Section 611.

The equities also favor granting an injunction. Once California commingles the challenged ballots with lawful ones, there is no way to get the challenged ballots back. The only way to preserve the district court's ability to grant relief to the United States after a full merits proceeding, therefore, is to segregate the challenged ballots now. That remedy would not cause any undue hardship to California. To the contrary, California's own election laws contemplate the segregation of challenged ballots, and the segregation of challenged ballots is a standard remedy in election cases.

To be sure, California and the United States disagree about the likely unlawfulness of the ballots at issue. "These dueling allegations can and should be investigated." App., *infra*, 130a (Bumatay, J., dissenting). In the meantime, however, an interim injunction is necessary "to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas* v. *Camenisch*, 451 U.S. 390, 395 (1981). To that end, the Court should issue a "limited injunction directing California to stop commingling suspected illegal ballots with legal ones" pending completion of the United States' appeal to the Ninth Circuit and further review in this Court. App., *infra*, 36a (Bumatay, J., dissenting).

**STATEMENT**

Congress has made it "unlawful for any alien to vote in any election" for President, Senator, or member of the House of Representatives. 18 U.S.C. 611(a). The Executive Branch uses a multi-step review process to identify aliens who may have violated that prohibition. See C.A. Doc. 28, at 17-20 (Oct. 29, 2026). First, U.S. Citizenship and Immigration Services (USCIS) reviews state voter rolls with the help of Accurint, a third-party data analytics and investigative platform that can use a voter's name and address to find additional data, such as his social security number,

birth date, and phone number. See *id.* at 17-18. After USCIS removes those whom it can identify as U.S. citizens, investigators from the Fraud Detection and National Security Directorate (a component of USCIS) manually review the remaining names. See *id.* at 19. Homeland Security Investigations (a component of U.S. Customs and Immigration Enforcement) conducts a further review before referring individuals for potential criminal investigation. See *id.* at 19-20.

As this Office has been informed, after processing a publicly accessible version of California's voter roll ahead of the 2026 midterm elections, the Executive Branch identified more than 20,000 individuals who appear to be registered as voters in California at the time the voter-roll information was received and whom the United States believes are likely to be aliens. See C.A. Doc. 28, at 20. On October 13, 2026, the federal government delivered a list of those individuals to the California Secretary of State and the Los Angeles County Registrar. See *ibid.* But the state officials have declined to cooperate with the United States by sharing the full unredacted version of its current voter roll. See *ibid.*

On October 15, the United States sued in the United States District Court for the Central District of California. App., *infra*, 46a. It named the State of California, the California Secretary of State, and the Los Angeles County Registrar as defendants. *Ibid.* Several civil-rights organizations intervened. *Ibid.* On October 19, relying on Section 611, the United States asked the district court to issue an order directing California to segregate—not to cancel—any mail ballots cast by the challenged individuals until those individuals' citizenship could be verified. *Id.* at 46a-47a.*

On October 22, before the district court acted on the United States' motion, the

* California law generally requires mail ballots to be postmarked by Election Day and to be received by seven days after Election Day. See Cal. Elec. Code § 3020(b).

United States appealed to the Ninth Circuit and sought an injunction pending appeal. App., *infra*, 71a. The Ninth Circuit denied the motion and dismissed the appeal for lack of appellate jurisdiction, rejecting the contention that the district court's inaction had amounted to a constructive denial of the United States' request for relief. *Id.* at 66a-82a. Judge Bennett issued a concurring opinion concluding that the United States' claim also fails on the merits. *Id.* at 83a-107a. Judge Sanchez issued a concurring opinion concluding that *Purcell* v. *Gonzalez*, 549 U.S. 1 (2006) (per curiam), precludes relief at this stage. App., *infra*, 108a-121a. Judge Bumatay issued a dissenting opinion concluding that the court of appeals had jurisdiction and that the United States is entitled to relief. *Id.* at 122a-156a.

On October 28, the district court denied the relief requested by the United States. App., *infra*, 40a-65a. The court determined that the United States does not have standing or a cause of action to bring this claim, *id.* at 48a-52a; that the United States is unlikely to succeed on its claim that Section 611 preempts California's actions, *id.* at 52a-56a; that the relief sought by the United States would likely violate other federal election laws, *id.* at 56a-59a; and that the equities did not support granting relief, *id.* at 59a-65a.

The Ninth Circuit denied the United States' motion for an injunction pending appeal. App., *infra*, 1a-21a. The Ninth Circuit first determined that it had appellate jurisdiction because the district court's order, though labeled as the denial of a temporary restraining order, was "tantamount to a denial of a preliminary injunction." *Id.* at 7a; see *id.* at 4a-7a. The Ninth Circuit also assumed that the United States has Article III standing and a cause of action to enforce Section 611. *Id.* at 4a. But it then concluded that the United States is unlikely to succeed on the merits of its as-applied claim that Section 611 preempts California's actions to count the ballots of

suspected noncitizens, *id.* at 8a-14a; that the relief sought could violate other federal statutes, *id.* at 14a-16a; that the United States does not face irreparable harm, *id.* at 17a-18a; and that granting relief at this stage would contravene *Purcell*, *id.* at 18a-21a. Judge Bumatay issued a dissenting opinion concluding that the court of appeals should have granted the United States' "reasonable request" to segregate "likely noncitizen ballots" until their lawfulness could be adjudicated. *Id.* at 39a; see *id.* at 22a-39a.

**ARGUMENT**

Under Rule 23 of the Rules of this Court and the All Writs Act, 28 U.S.C. 1651, the Court may grant an injunction pending the disposition of an appeal. See *Libby* v. *Fecteau*, 145 S. Ct. 1378, 1378 (2025). Under the familiar standard for an interim injunction, the applicant must show that it is likely to succeed on the merits, that it faces irreparable harm, and that the balance of hardships and public interest favor interim relief. See *Winter* v. *NRDC, Inc.*, 555 U.S. 7, 20 (2008). As usual when considering an application for interim relief, this Court also considers whether the underlying case warrants the Court's review. See *Does 1-3* v. *Mills*, 142 S. Ct. 17, 18 (2021) (Barrett, J., concurring in the denial of application for injunctive relief). A request for an injunction usually requires a "higher justification than a request for a stay because, unlike a stay, an injunction does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts." *Respect Maine PAC* v. *McKee*, 562 U.S. 996, 996 (2010).

Those general principles are subject to "refinement" in "the election context." *Merrill* v. *Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring in grant of applications for stays). In that context, the proper interim remedy when a litigant brings a potentially meritorious challenge to the validity of a ballot is generally to

segregate the ballot until its lawfulness can be adjudicated. See, *e.g.*, *Roe* v. *Alabama by and through Evans*, 43 F.3d 574, 583 (11th Cir. 1985). "Count first, and rule upon legality afterwards, is not a recipe for producing election results that have the public acceptance democratic stability requires." *Bost* v. *Illinois State Board of Elections*, 607 U.S. 71, 80 (2026). Indeed, here, it would be too late to ascertain the lawfulness of suspected unlawful ballots after they have been commingled with lawful ballots.

The issuance of interim relief in *Republican Party of Pennsylvania* v. *Boockvar*, 2020 WL 6536912 (Nov. 6, 2020), illustrates those principles. There, the Pennsylvania General Assembly had set a deadline of 8 p.m. on election day for receiving mail ballots, but the Pennsylvania Supreme Court had extended that deadline by three days. See *Republican Party of Pennsylvania* v. *DeGraffenreid*, 592 U.S. 1287, 1288 (2021) (Thomas, J., dissenting from the denial of certiorari). Justice Alito, as Circuit Justice, ordered that "all ballots received by mail after [the deadline set by the state legislature] be segregated" from other ballots and that "all such ballots, if counted, be counted separately." *Boockvar*, 2020 WL 6536912, at *1. Fortunately, the segregated ballots ultimately did not affect the outcome. See *DeGraffenreid*, 592 U.S. at 1290 (Thomas, J., dissenting from the denial of certiorari).

Under that standard, this Court should issue an interim injunction directing California to segregate ballots cast by the individuals who may be registered to vote in California and have been identified by the federal government as likely noncitizens. That "modest remedy" "would not cancel any vote"; instead, it would just "sto[p] California from mixing the ballots of citizens and suspected noncitizens" and would "allow time to verify the eligibility of suspected noncitizens." App., *infra*, 22a (Bumatay, J., dissenting). Each of traditional factors supports that "reasonable request." *Ibid.*

### A. The United States Is Likely To Succeed On Appeal

Federal law provides that it "shall be unlawful for any alien to vote in any election held solely or in part for the purpose of electing a candidate for the office of President, Vice President, Presidential elector, Member of the Senate, [or] Member of the House of Representatives." 18 U.S.C. 611(a). An alien may vote only if "the election is held partly for some other purpose," "aliens are authorized to vote for such other purpose" under state law, and "voting for such other purpose is conducted independently of voting for a candidate for [a] Federal office." *Ibid.* A violation is a crime, punishable by up to a year of imprisonment. See 18 U.S.C. 611(b).

Because it is "unlawful for any alien to vote" in a federal election, 18 U.S.C. 611, it follows that any ballot cast by an alien is unlawful. It also follows that a State may not count such an invalid ballot. After all, a State must give "full value and effect" to votes cast by qualified U.S. citizens. *United States* v. *Saylor*, 322 U.S. 385, 386 (1944). Valid votes may not be "impaired, lessened, diminished, [or] diluted." *Ibid.* Just as a State may not debase or dilute valid votes by stuffing a ballot box with fictitious votes, see *Ex parte Siebold*, 100 U.S. 371 (1879), it also may not debase or dilute valid votes by tabulating invalid votes.

In this case, this Office is informed that the Executive Branch has identified over 20,000 individuals who appear to be registered to vote in California based on publicly accessible information and who, based on the Executive Branch's review, are likely not U.S. citizens. Those individuals have received mail ballots, consistent with state law requiring that every registered voter be sent such a ballot. See Cal. Elec. Code § 3000.5. Yet California is now poised to tabulate ballots cast by those individuals. If it turns out that those individuals cast ballots but are not, in fact, U.S. citizens, then California's counting of their votes will violate Section 611 and will debase

or dilute valid votes cast by U.S. citizens.

The litigants, to be sure, dispute whether the individuals identified by the United States are registered voters in California who are actually aliens. But to obtain interim relief, the United States need not show that it will definitely prevail at the conclusion of the litigation. For now, a likelihood of success is enough, and the United States has shown a sufficient likelihood that California is about to violate the law by counting aliens' ballots. That likelihood supports an interim injunction requiring California to segregate the questioned ballots until their lawfulness can be adjudicated.

The court of appeals and district court identified several reasons for rejecting that conclusion. None is meritorious.

***Standing.*** The district court (though not the court of appeals) first concluded that the United States lacks Article III standing. See App., *infra*, 48a-51a. That theory is wrong because the United States has Article III standing to enforce its own laws. See *id.* at 133a (Bumatay, J., dissenting). In general, every sovereign has a judicially cognizable "sovereign interes[t]" in its "power to create and enforce a legal code, both civil and criminal," "within the relevant jurisdiction." *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). More specifically, the Executive Branch—which has the power to "execut[e]" the laws, U.S. Const. Art. II, § 1, Cl. 1, and the duty to "take Care that the Laws be faithfully executed," U.S. Const. Art. II, § 3—has a judicially cognizable sovereign interest in enforcing federal statutes. It is therefore "beyond doubt" that the United States suffers a judicially cognizable "injury to its sovereignty" from any "violation of its laws." *Vermont Agency of Natural Resources* v. *United States ex rel. Stevens*, 529 U.S. 765, 771 (2000); see, *e.g.*, *Stauffer* v. *Brooks Brothers, Inc.*, 619 F.3d 132, 1325 (Fed. Cir. 2010) ("The parties

have not cited any case in which the government has been denied standing to enforce its own law."); *United States* v. *Yarbrough*, 452 Fed. Appx. 186, 189 (3d Cir. 2011) (rejecting as "frivolous" the contention that the United States lacked "standing to enforce its own laws").

The district court insisted that the United States has not suffered an Article III injury because the United States retains the ability to indict and prosecute aliens who cast ballots in California. See App., *infra*, 49a. The United States' argument in this case, however, is that federal law not only prohibits aliens from voting in federal elections but also prohibits California from counting their illegal votes. The United States suffers just as much an Article III injury from a violation of the latter requirement as it does from a violation of the former one. To be sure, California might contest the United States' reading of Section 611; it might believe that, although Section 611 bars aliens from voting, it leaves California free to count the aliens' illegal votes. But any such argument goes to the merits, not standing. In general, "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth* v. *Seldin*, 422 U.S. 490, 500 (1975); see, *e.g.*, *FEC* v. *Ted Cruz for Senate*, 596 U.S. 289, 298 (2022).

***Cause of action.*** The district court (but not the court of appeals) also concluded that the United States lacks a cause of action. See App., *infra*, 51a-52a. That, too, is incorrect. See *id.* at 137a-138a (Bumatay, J., dissenting). Generally, a plaintiff may sue in federal court for equitable relief "against state officers who are violating, or planning to violate, federal law." *Armstrong* v. *Exceptional Child Center, Inc.*, 575 U.S. 320, 326 (2015); see, *e.g.*, *Ex parte Young*, 209 U.S. 123, 150-151 (1908). Such suits for equitable relief may be brought not only by private plaintiffs, but also by the United States. See, *e.g.*, *Arizona* v. *United States*, 567 U.S. 387 (2012); *United States*

v. *South Carolina*, 720 F.3d 518 (4th Cir. 2013); see also 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1668 (1833) ("It would be a perfect novelty in the history of national jurisprudence, as well as of public law, that a sovereign had no authority to sue in his own courts. * * * A sovereign without the means of enforcing civil rights, or compelling the performance, either civilly or criminally, of public duties[,] * * * would be a most extraordinary anomaly.").

Instead of focusing on *Ex parte Young* (the case that governs suits in equity against state actors), the district court focused on *In re Debs*, 158 U.S. 564 (1895) (a case addressing suits in equity against private parties). App., *infra*, 51a-52a. The court reasoned that *Debs* allows the federal government to "sue in equity without a statutory grant of authority" only "to protect 'a property interest'" or to prevent an "'interference with national security or a burden on interstate commerce.'" *Id.* at 51a. Because this suit is brought against state actors rather than private parties, however, this suit may proceed even assuming for the sake of argument that the district court is right about the scope of *Debs*. A private party could invoke *Ex parte Young* to challenge a State's violation of federal law, even if that violation does not impair a property interest, interfere with national security, or burden interstate commerce. The United States may avail itself of the same equitable right of action as such a private party.

***Preemption.*** The court of appeals and district court both concluded that the United States is unlikely to succeed on the merits of its claim that federal law preempts California's counting of the challenged ballots. App., *infra*, 8a-14a, 52a-56a. Section 611, however, unambiguously provides that "[i]t shall be unlawful for any alien to vote in any [federal] election." 18 U.S.C. 611(a). A state law or practice that allows an alien to vote in a federal election, or that treats an alien's vote as valid,

conflicts with that provision and so is preempted. See App., *infra*, 30a-33a.

The court of appeals emphasized that the Elections Clause provides that "[t]he Times, Places and Manners of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const. Art. I, § 4, Cl. 1; see App., *infra*, 8a-9a. As the court recognized, however, the Elections Clause also provides that "Congress may at any time make or alter such Regulations." U.S. Const. Art. I, § 4, Cl. 1. Further, under the Supremacy Clause, a state election law—like any other state law—is subordinate to laws enacted by Congress pursuant to its other enumerated powers. See U.S. Const. Art. VI, Cl. 2. The fact that the Elections Clause authorizes California to regulate elections thus does not advance the analysis; if a California election regulation conflicts with Section 611, it must yield.

The court of appeals also found it "unclear (at best) whether Congress intended § 611 to have any preemptive effect, much less a preemptive effect that forces states to set aside their own state election laws and procedures." App., *infra*, 12a. But a federal law's preemptive effect does not flow from Congress's "intent" that the law have such an effect. Instead, it flows directly from the Supremacy Clause, which provides that "the Laws of the United States" are "the supreme Law of the Land," "any Thing in the * * * Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI, § 2. Section 611, by virtue of the Supremacy Clause, preempts any conflicting state law or action; no further showing of congressional "intent" is required.

The court of appeals observed that California has its own ban on voting by aliens and that California enforces that ban by requiring applicants to attest to their citizenship under penalty of perjury. App., *infra*, 11a. But that misses the point. California is entitled to prescribe the procedures it deems appropriate for enforcing

its own state-law ban on alien voting, but those *state* procedures do not control the operation of Section 611's separate *federal* ban on alien voting. In general, when applying federal law, "a federal court must make an independent inquiry, whether or not there has been an inquiry by [state officials], and irrespective of how any such inquiry may have turned out." *Elkins* v. *United States*, 364 U.S. 206, 224 (1960).

For example, if the United States were to bring a criminal prosecution against an individual for violating Section 611, a federal court obviously would not be bound by California's procedures for determining the individual's citizenship. California's acceptance of the individual's attestation might be relevant evidence, but it would not be conclusive. A civil suit to enforce Section 611 should work the same way. If the United States shows in such a civil suit that a particular individual is in fact an alien, then a federal court should order the State to refrain from counting that person's ballot—whatever effect that individual's contrary attestation might have for purposes of state law. Similarly, if the United States establishes at a preliminary stage that there is a likelihood that an individual is in fact an alien, then a federal court should order that the person's ballot be segregated until the factual dispute can be resolved—again, whatever effect that individual's attestation might have under state law.

***Other federal laws.*** The court of appeals and district court both concluded that the segregation of ballots would likely violate the National Voter Registration Act of 1993 (NVRA), and the district court concluded that it would also likely violate the Voting Rights Act Amendments of 1970 (Voting Rights Act) and the Civil Rights Act of 1964 (Civil Rights Act). App., *infra*, 15a-16a, 56a-59a. Those conclusions all lack merit. See App., *infra*, 38a-39a (Bumatay, J., dissenting).

The NVRA provides that a State may not conduct, within the 90 days before the date of a federal election, "any program the purpose of which is to systematically

remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. 20507(c)(2)(A). This Court will consider, later this Term, whether that provision restricts a State's ability to remove aliens from the voter rolls. See *RNC* v. *Mi Familia Vota*, No. 25-1017 (oral argument scheduled for Dec. 8, 2026). But even assuming the provision does so, the provision would not preclude the relief here. The relief sought by the United States would require only that ballots be segregated—not that anyone be removed from the official list of eligible voters. The court of appeals speculated that "the consequence" of such relief might ultimately be "the removal of voters" found to be ineligible, App., *infra*, 15a, but the NVRA's text focuses on "the purpose" of the program, not its predicted consequences, 52 U.S.C. 20507(c)(2)(A). See 26-7070 C.A. Doc. 32, at 12 (Oct. 24, 2026) (Los Angeles County Registrar's acknowledgment that "this lawsuit is not about maintenance of voter rolls").

The Voting Rights Act provides that "[n]o person acting under color of law shall fail or refuse to permit any person to vote who is * * * qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote." 52 U.S.C. 10307(a). But aliens are not "qualified to vote." And segregating a person's ballot until his citizenship can be confirmed does not amount to a "fail[ure] or refus[al]" "to permit [the] person to vote" or "to tabulate, count, and report such person's vote." *Ibid.* The segregation of the ballot simply defers a decision on whether to tabulate, count, and report the vote until the vote's validity can be ascertained.

Finally, the Civil Rights Act provides that "[n]o person acting under color of law shall in determining whether any individual is qualified under State law or laws to vote in any election apply any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been

found by State officials to be qualified to vote." 52 U.S.C. 10101(a)(2)(A). There are multiple reasons why that provision is beside the point here, but the simplest is that it is limited to "determin[ations] whether any individual is qualified *under State law or laws* to vote." *Ibid.* (emphasis added). This case concerns whether individuals are qualified under a federal statute, see 18 U.S.C. 611(a), not under state law.

***Facts.*** The central factual issue in this case is whether the individuals identified by the federal government are registered voters in California who are casting ballots and are, in fact, aliens. The district court suggested (albeit in addressing the equities rather than the merits) that the federal government's allegations "are not credible." App., *infra*, 60a. But that conclusion is legally erroneous.

To begin, the United States has not yet had a full opportunity to prove its claims. The United States' witnesses were available to testify at the district court's hearing. See C.A. Doc. 28, at 33. Yet the court declined to hear their testimony and instead chose to resolve the case on the papers. See *ibid.* In these circumstances, the court's conclusions concerning the credibility of the United States' allegations carry little weight.

Regardless, the district court committed clear error in rejecting the United States' factual contentions. The United States has submitted declarations explaining what data it used to match registered voters to noncitizen records. See C.A. Doc. 28, at 33-34; D. Ct. Doc. 22-3 (Oct. 19, 2026); D. Ct. Doc. 22-4 (Oct. 19, 2026). The district court raised a series of objections to the United States' evidence, but it identified no affirmative evidence on the other side. In other words, the United States has identified numerous individuals who are, in its view, likely aliens, but the district court did not point to any evidence that any of those individuals is actually a citizen.

In all events, this Court need not resolve any factual disputes about whether

any particular individual is a California voter and is an alien or a citizen. The sole issue for now is whether California should be required to segregate the challenged ballots until such factual disputes can be resolved by the lower courts in the first instance. The United States has made a sufficient showing to justify granting that relief.

### B. The Other Factors Support Injunctive Relief

To obtain an interim injunction, the United States must also show that the underlying case warrants this Court's review, that it faces irreparable harm, and that the balance of hardships and public interest tip in its favor. Those factors support granting this application.

***Certworthiness.*** The United States has a profound interest in the integrity of federal elections. See *Burroughs* v. *United States*, 290 U.S. 534, 545 (1934); *Ex parte Yarbrough*, 110 U.S. 651, 657-658 (1884). More specifically, the United States has a profound interest in ensuring that aliens do not participate in those elections. "It is fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government." *Bluman* v. *FEC*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (three-judge court) (Kavanaugh, J.). Congress has sought to pursue that interest by prohibiting aliens from voting in federal elections. See 18 U.S.C. 611. That vital national interest is undermined by allowing aliens to vote, and to have their votes counted, in the face of evidence that their ballots are unlawful. A decision of the Ninth Circuit sustaining a procedure leading to such an outcome would warrant this Court's review.

***Irreparable harm.*** The United States faces irreparable harm in the absence of injunctive relief. "California admits that there is no way to trace a ballot after it

is processed." App., *infra*, 149a (Bumatay, J., dissenting). "So there is no way for the district court to repair the government's injury"—"noncitizens voting in a federal election"—"after a full merits proceeding." *Ibid.* Put another way, "[i]naction means that suspected noncitizens' votes are forever commingled and the federal government loses out on any possible redress." *Id.* at 130a. That injury "grows every day," "as hundreds of thousands of ballots" arrive and are counted. *Id.* at 149a. That injury will continue to mount through Tuesday, November 10 (a week after election day, California's deadline for receiving mail ballots). See p. 4 n.*. That injury can be prevented by a "limited injunction preventing California election officials from mixing the ballots of those identified as suspected aliens * * * with the rest of the ballots." App., *infra*, 148a-149a.

The court of appeals determined that the United States was unlikely to suffer irreparable harm because its "preemption argument is likely unavailing" and because the district court "found that the United States's process in creating the [list] was not credible." App., *infra*, 17a. But those arguments assume that the United States is wrong on the merits and thus make the irreparable-harm inquiry redundant with the likelihood-of-success inquiry. The relevant question in granting interim relief is instead whether, "assuming the applicant's position on the merits is *correct*, there [is] a likelihood of irreparable harm" if interim relief is not granted. *Philip Morris USA Inc.* v. *Scott*, 561 U.S. 1301, 1301 (2010) (Scalia, J., in chambers) (emphasis added); see *Barnes* v. *E-Systems, Inc. Group Hospital Medical & Surgical Insurance Plan*, 501 U.S. 1301, 1302 (1991) (Scalia, J., in chambers) ("There must be * * * a likelihood of irreparable harm (assuming the correctness of the applicant's position)."). If the United States is correct, and the individuals it has identified (or even some of those individuals) turn out to be aliens who are unlawfully voting in California, then the

United States will suffer irreparable harm from the commingling of their ballots with lawful votes.

***Balance of hardships and public interest.*** The court of appeals and district court credited California's representations that the interim relief sought by the United States would "provoke catastrophic change, upending the administration of the election." App., *infra*, 18a. That doomsday prediction ignores that segregating ballots is a routine remedy when the lawfulness of ballots is questioned. California law itself contemplates the segregation of challenged ballots, providing that "challenged ballot[s] shall be set aside" and that "[r]esolution of challenged ballots shall take place in a segregated area * * * to avoid confusion and mixing of ballots." Cal. Code Regs. Tit. 2, § 20363. Moreover, one county registrar has attested that "locating and segregating challenged ballots is entirely possible." App., *infra*, 37a-38a (Bumatay, J., dissenting). Following the segregation procedure that California's own law already establishes may prove to be "a challenge," "[b]ut difficulty is no reason for courts to throw [their] hands in the air and give up—not when the threat is illegal votes undermining our elections." *Id.* at 37a.

The court of appeals and district court invoked *Purcell* v. *Gonzalez*, 549 U.S. 1 (2006) (per curiam), which establishes that, as a general matter, federal courts should not alter state election rules on the eve of an election. But that principle does not apply here. See App., *infra*, 153a-155a (Bumatay, J., doctrine). *Purcell* limits federal judicial intervention in the period *before* votes are cast. This case, however, concerns what happens *after* votes are cast. It is well established that, at that point, federal courts may issue appropriate relief to enforce federal law, see, *e.g.*, *Bush* v. *Gore*, 531 U.S. 98 (2000) (per curiam)—including by requiring the segregation of challenged ballots until their lawfulness can be determined, see *Boockvar*, 2020 WL 6536912.

That distinction between pre-voting and post-voting intervention makes sense. *Purcell* rests chiefly on the understanding that voters need to know "the rules of the road" ("how, when, and where" to vote), *DNC* v. *Wisconsin State Legislature*, 592 U.S. 1039, 1043 (2020) (Kavanaugh, J., concurring), and that "[c]ourt orders affecting elections" can "result in voter confusion and consequent incentive to remain away from the polls," *Purcell*, 549 U.S. at 4-5. It also reflects the recognition that "[l]ate judicial tinkering with election laws can lead * * * to unanticipated and unfair consequences for candidates, political parties, and voters." *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring in grant of applications for stays). Those concerns simply do not arise after voting has already occurred. Here, "whether state officials commingle ballots that have already been submitted can't possibly cause voter confusion about how, when, or where to vote—the only ballots affected will already have been cast." App., *infra*, 153a-154a (Bumatay, J., dissenting). Nor does segregating ballots threaten unfair consequences for candidates, political parties, or voters. Instead, it "just gives election officials a chance to determine whether ballots are legal." *Id.* at 154a.

## CONCLUSION

This Court should issue an injunction, pending the United States' appeal to the Ninth Circuit and any subsequent proceedings in this Court, that requires California to segregate mail ballots from persons whom the United States has identified as likely noncitizens. The Court should also enter an administrative injunction to that effect while it considers this application.

Respectfully submitted.

D. JOHN SAUER
*Solicitor General*

NOVEMBER 2026